# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MATTHEW CARR, TERRY CARR, DAVID TUMBLIN, GREGORY BROWN,** and **JAMES CHECCA,** *individually and on behalf of all others similarly situated,* | **CIVIL ACTION**<br><br>**No. 15-6391** |
| **Plaintiffs,** | |
| **v.** | |
| **FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF OXFORD, INC.,** | |
| **Defendants.** | |
| **LUKE BOULANGE**, *on behalf of himself and all others similarly situated,* | **CIVIL ACTION**<br><br>**No. 16-2581** |
| **Plaintiffs,** | |
| **v.** | |
| **FLOWERS FOODS, INC. and FLOWERS BAKING CO. OF OXFORD, INC.,** | |
| **Defendants.** | |

## MEMORANDUM OF DEFENDANTS FLOWERS FOODS, INC. AND FLOWERS BAKING CO. OF OXFORD, INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................... 1

II.  FACTUAL BACKGROUND .................................................................... 2

    A.   Overview of Defendants' Distribution System. ............................... 3

        1.   The Distributor Agreement Does Not Create a Regime of Uniform Control Over Distributors. .................................... 4

        2.   The National Accounts and Field Marketing Teams do Not Create a Regime of Uniform Control over Distributors. ......... 6

    B.   Distributors are Not Subject to Uniform "Controls" and, to the Contrary, Choose to Operate Their Businesses in Very Different Ways. ........................ 7

        1.   Much of the "Control" Alleged by Plaintiffs is Dictated by Customer Service Requirements. ....................... 7

        2.   Distributors are Not Required to Service Their Territories Personally and are Free to Engage in Non-Competitive Work. .................. 9

        3.   Distributors are Not Subject to Uniform Control with Respect to Scheduling. ......................................... 10

        4.   Distributors are Not Subject to Uniform Control with Respect to Promotions, Product Placement, and Displays. ....................... 12

        5.   Not All Distributors Are Subject to the Same Degree of Oversight by Sales Directors. ............................. 14

        6.   Distributors are Not Subject to Uniform Control with Respect to Ordering. ............................................. 15

        7.   Distributors are Not Subject to Uniform Control with Respect to Pricing and Margins. ..................................... 17

        8.   Distributors are Not Subject to Uniform Stale Relief Policies. .............. 18

        9.   Distributors are Not Subject to Uniform Control with Respect to Territory Sales. ........................................ 19

        10.  Distributors are Not Subject to Uniform Control with Respect to Their Appearance. ....................................... 20

    C.   Distributors Manage their Businesses and Take Advantage of their Entrepreneurial Opportunities In Very Different Ways. ............... 21

III. ARGUMENT ........................................................................................ 23

    A.   Class Certification Under Rule 23(b)(2) of the Pennsylvania, Maryland and New Jersey Subclasses is Inappropriate Because Injunctive Relief Cannot Apply Generally to All Such Subclasses. ................... 24

B.  Plaintiffs Cannot Demonstrate that the Pennsylvania, Maryland, and New
    Jersey Rule 23 Classes are Ascertainable under Rule 23(b)(3). ................................... 26

C.  The Court Should Not Certify a Rule 23 Class with Respect to The
    Pennsylvania Claims Because Plaintiffs Have Failed to Establish
    Common Questions of Law or Fact and Because Individual Issues
    Predominate. .................................................................................................................. 32

    1.  The Pennsylvania Minimum Wage Act ("PMWA") Claim for
        Overtime Should Not be Certified as a Class Action. ............................................. 33

        a.  The PMWA overtime claim cannot be resolved on a class-wide
            basis because the threshold classification issue requires
            application of the economic realities test........................................................... 33

        b.  The PMWA claim cannot be resolved on a class-wide basis
            because Plaintiffs' hours of overtime work, if any, and
            Defendants' knowledge of the same are individualized inquires
            and not subject to representative proof. ............................................................. 36

        c.  The PMWA claim cannot be resolved on a class-wide basis
            because the Motor Carrier Act exemption requires individualized
            proof...................................................................................................................... 38

        d.  The PMWA claim cannot be resolved on a class-wide basis
            because the sales exemption requires individualized proof............................... 40

    2.  The Pennsylvania Wage Payment Collection Law ("PWPCL")
        Claim for Deductions Should Not be Certified as a Class Action......................... 42

        a.  The PWPCL claim cannot be resolved on a class-wide basis
            because Flowers Distributor Agreement sets forth only a general
            framework thus requiring individualized evidence of course of
            dealings with distributors.................................................................................... 42

        b.  The PWPCL claim cannot be resolved on a class-wide basis
            because determining whether a distributor is engaged in a distinct
            occupational business necessarily requires individualized
            inquiries. .............................................................................................................. 45

        c.  The PWPCL claim cannot be resolved on a class-wide basis
            because individual inquiries regarding deduction authorizations
            predominate. ......................................................................................................... 46

D.  The Court Should Not Certify a Rule 23 Class with Respect to The
    Maryland Claims Because Plaintiffs Have Failed to Establish Common
    Questions of Law or Fact and Because Individual Issues Predominate. ....................... 47

    1.  The Maryland Wage and Hour Law ("MWHL") Claim for Overtime
        Should Not Be Certified as a Class Action.............................................................. 47

ii

      a.   The MWHL claim for overtime cannot be resolved on a class-wide basis because the threshold classification issue requires application of the economic realities test.............................................. 47

      b.   The MWHL claim for overtime cannot be resolved on a class-wide basis because Plaintiffs' hours of overtime work, if any, and Defendants' knowledge of the same are individualized inquiries and not subject to representative proof. ............................................. 50

      c.   The MWHL claim cannot be resolved on a class-wide basis because the Motor Carrier Act exemption requires individualized proof........................................................................................ 52

      d.   The MWHL claim cannot be resolved on a class-wide basis because the outside sales exemption requires individualized proof. 53

    2.   The Maryland Wage Payment Collection Law ("MWPCL") Claim for Deductions Should Not Be Certified as a Class Action.................................... 54

  E.   The Court Should Not Certify a Rule 23 Class with Respect to The New Jersey Claims Because Plaintiffs Have Failed to Establish Common Questions of Law or Fact and Because Individual Issues Predominate. ...................... 55

    1.   The New Jersey Wage and Hour Law ("NJWHL") Claim for Overtime Should Not be Certified as a Class Action. .............................................. 55

      a.   The NJWHL claim cannot resolved on a class-wide basis because the threshold classification issue requires application of the ABC test........................................................................................ 55

      b.   The NJMWA claim cannot be resolved on a class-wide basis because their hours of overtime work, if any, and Defendants' knowledge of same are necessarily individualized and not subject to representative proof. ...................................................................... 63

      c.   The NJWHL claim cannot be resolved on a class-wide basis because the outside sales exemption requires individualized proof. 64

    2.   The New Jersey Wage Payment Law ("NJPWL") Claim for Deductions Should Not be Certified as a Class Action Because the Threshold Classification Issue Requires Application of the ABC Test........................................................................................ 65

IV.  CONCLUSION ........................................................................................ 66

**REQUEST FOR ORAL ARGUMENT**.................................................................... 67

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraham v. Ocwen Loan Servicing, LLC*,
　321 F.R.D. 125 (E.D. Pa. 2017)................................................................27

*ABS Grp. Servs., Inc. v. Bd. of Review*,
　2014 WL 11291266 (N.J. Super. April 27, 2016) ...................................56

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*,
　133 S. Ct. 1184 (2013).............................................................................55

*Barfield v. N.Y. City Health & Hospitals Corp.*,
　537 F.3d 132 (2d Cir. 2008).....................................................................47

*Bearden v. AAA Auto Club South*,
　2013 WL 1181474 (W.D. Tenn. Mar. 18, 2013) .....................................65

*Bedoya v. Am. Eagle Exp. Inc.*,
　2017 WL 4330351 (D.N.J. Sept. 29, 2017) .............................................60

*Brickey v. Dolgencorp, Inc.*,
　272 F.R.D. 344 (W.D.N.Y. 2011).............................................................51

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
　155 F.3d 331 (4th Cir. 1998) ...................................................................26

*Campusano v. Lusitano Construction LLC*,
　56 A.3d 303 (Md. Ct. Spec. App. 2012) ..................................................47

*Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*,
　593 A.2d 1171 (N.J. 1991)............................................................56, 59, 60, 61

*Carr et al. v. Flowers Foods, Inc. et al.*,
　No. 15-cv-6391 (E.D. Pa.) ..........................................................................1

*Carrera v. Bayer Corp.*,
　727 F.3d 300 (3d Cir. 2013)...............................................................26, 27

*Christopher v. SmithKline Beecham Corp.*,
　567 U.S. 142 (2012).................................................................................40

*Commonwealth, Dep't of Labor & Indus. v. Stuber*,
　822 A.2d 870 (Pa. Commw. Ct. 2003) ....................................................33

iv

*Diabate v. MV Transportation, Inc.*,
  No. 14-cv-857-WB, 2015 WL 4496616 (E.D. Pa. July 20, 2015)...........................................37

*Drexel v. Union Prescription Ctrs., Inc.*,
  582 F.2d 781 (3d Cir. 1978)..................................................................................................42

*Drubetskoy v. Wells Fargo Bank, N.A.*,
  2013 WL 6839508 (D. Md. Dec. 20, 2013)...........................................................................53

*Ealy v. Pinkerton Gov't Servs., Inc.*,
  2013 WL 980035 (4th Cir. 2013) ..........................................................................................51

*Eshavarria v. Williams Sonoma, Inc.*,
  2016 WL 1047225 (D.N.J. 2016) ...........................................................................................62

*Evans v. Lowe's Home Centers, Inc.*,
  2006 WL 1371073 (M.D. Pa. May 18, 2006).........................................................................36

*Faust v. Comcast Cable Comms. Mgmt., LLC*,
  2011 WL 3534008 (D. Md. 2014) ..........................................................................................51

*Fed-Ex Home Delivery v. NLRB*,
  563 F.3d 492 (D.C. Cir. 2009)...............................................................................................57

*In re FedEx Ground Package Sys., Inc., Empl. Practices Litig.*,
  273 F.R.D. 516 (N.D. Ind. 2010)...........................................................................................56

*Flores v. Supervalu, Inc.*,
  509 F. App'x 593 (9th Cir. 2013) ...........................................................................................44

*Grace v. Family Dollar Stores*,
  2007 WL 2669699 (W.D.N.C. Sep. 6, 2007) ........................................................................65

*Harbourt v. PPE Casino Resorts Md., LLC*,
  820 F.3d 655 (4th Cir. 2016) ...........................................................................................47, 54

*Hargrove v. Sleepy's, LLC*,
  106 A.3d 449 (N.J. 2015)........................................................................................................56

*Hargrove v. Sleepy's LLC*,
  612 F. App'x 116 (3d Cir. 2015) ......................................................................................55, 56

*Harrison v. Delguerico's Wrecking & Salvage*,
  No. 13-cv-5353, 2016 WL 826824 (E.D. Pa. Mar. 2, 2016) ............................................39, 53

*Hausfeld v. Love Funding Corp.*,
  131 F. Supp. 3d 443 (D. Md. Sept. 17, 2015)........................................................................28

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008)..................................................................32

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
    313 U.S. 487 (1941)..........................................................................29

*In re Linerboard Antitrust Litig.,*
    305 F.3d 145 (3d Cir. 2002)............................................................36, 63

*Luxama v. Ironbound Express, Inc.,*
    2012 WL 5973277 (D.N.J. Jun. 28, 2013)..............................................58

*Magalhaes v. Lowe's Home Ctrs., Inc.,*
    2014 WL 907675 (D. Mass. Mar. 10, 2014)......................................56, 61

*Martinez v. Flowers Foods, Inc.,*
    2016 WL 10746664 (C.D. Cal. Feb. 1, 2016)..........................................59

*Masterson v. Fed. Exp. Corp.,*
    269 F.R.D. 439 (M.D. Pa. 2010)..........................................................37

*Mazzarella v. Fast Rig Support, LLC,*
    823 F.3d 786 (3d Cir. 2016)................................................................38

*McGoldrick v. TruePosition, Inc.,*
    623 F. Supp. 2d 619 (E.D. Pa. 2009)....................................................28

*McMaster v. Eastern Armored Servs., Inc.,*
    780 F.3d 167 (3d Cir. 2015)................................................................39

*Merlo v. Federal Express Corp.,*
    2010 WL 2326577 (D.N.J. June 7, 2010)...............................................63

*Miller v. Cerebain Biotech Corp.,*
    No. 16-cv-3943, 2016 WL 6600009 (E.D. Pa. Nov. 8, 2016)....................45

*Myers v. Jani-King of Phila., Inc.,*
    No. 09-cv-1738, 2015 WL 1055700 (E.D. Pa. Mar. 11, 2015)...................42

*Myszkowski v. Penn Stroud Hotel, Inc.,*
    634 A.2d 622 (Pa. Super. Ct. 1993)......................................................42

*Newell v. Runnells,*
    967 A.2d 729 (Md. 2009)...................................................................47

*Overton v. Sanofi-Aventis U.S., LLC,*
    2014 WL 5410653 (D.N.J. Oct. 23, 2014)..............................................28

vi

*Phila. Newspapers, Inc. v. Bd. of Review*,
   937 A.2d 318 (N.J. App. Div. 2007).................................................................57

*In re Prospect Mortg., LLC, Fair Labor Standards Act (FLSA) & Wage & Hour*
   *Litig.*, 987 F. Supp. 2d 1383 (J.P.M.L. 2013) ...........................................41

*Reed v. Empire Auto Parts, Inc.*,
   2015 WL 761894 (D.N.J. Feb. 23, 2015) ...........................................63

*Resch v. Krapf's Coaches, Inc.*,
   785 F.3d 869 (3d Cir. 2015)................................................................38

*Rojas v. Garda CL Se., Inc.*,
   2015 WL 5084135 (S.D. Fla. Aug. 28, 2015).....................................40

*Romero v. H.B. Auto. Group*,
   2012 WL 1514810 (S.D.N.Y. May 1, 2012) ........................................65

*Schwann v. FedEx Ground Package Sys., Inc.*,
   2013 WL 1292432 (D. Mass. Apr. 1, 2013) .......................................55, 56, 60, 61

*Sherman v. Am. Eagle Exp., Inc.*,
   No. 09-cv-575, 2012 WL 748400 (E.D. Pa. Mar. 8, 2012) ................33, 34

*Soares v. Flowers Foods, Inc.*,
   320 F.R.D. 464 (N.D. Ca. 2017) ........................................................45, 62

*Sofranko v. Northwestern Mut. Life Ins.*,
   2008 WL 145509 (W.D. Pa. Jan. 14, 2008)........................................33

*Swank v. Wal-Mart Stores, Inc.*,
   2018 WL 2684102 (W.D. Pa. June 5, 2018)........................................36

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .........................................................26

*Veney v. John W. Clarke, Inc.*,
   28 F. Supp. 3d 435 (D. Md. 2014) .....................................................51

*Verma v. 3001 Castor, Inc.*,
   No. 13-cv-3034, 2014 WL 2957453 (E.D. Pa. June 30, 2014)............36

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
   No. 2:06-cv-1833-MSG, 2015 WL 3623005 (E.D. Pa. Jun. 10, 2015) ...........28, 29

*Wal-Mart v. Dukes*, 564 U.S. 338 (2011) ...........................................23, 24, 33, 44, 50

vii

*Walters v. American Coach Lines of Miami, Inc.*,
    575 F.3d 1221 (11th Cir. 2009) ...........................................39

*Youtie v. Macy's Retail Holding, Inc.*,
    626 F. Supp. 2d 511 (E.D. Pa. 2009) ...................................30

**Statutes**

43 Pa. Stat. Ann. § 333.105 ..................................................38, 40

29 U.S.C. § 213(a)(1)................................................................64

29 U.S.C. § 213(b)(1) ..........................................................38, 52

49 U.S.C. § 3102(b)(1) and (2) ................................................38

49 U.S.C. § 14501(c)(1)............................................................60

49 U.S.C. § 31132 ....................................................................52

49 U.S.C. § 31502 ....................................................................51

49 U.S.C. §§ 31502(b), 31132(2)(A) .......................................38

Federal Aviation Administration Authorization Act of 1994 .................................60, 61

Fair Labor Standards Act ....................38, 39, 41, 47, 52, 53, 54, 64, 65

M.G.L. c. 149, § 148B(2)..........................................................60

Maryland Wage and Hour Law.............................................47, 53

Maryland Wage Payment Collection Law .................47, 50, 51, 53, 54, 55

Motor Carrier Act ............................37, 39, 40, 51, 52, 53, 65

Md. Code, Lab. & Empl. § 3-403(4)........................................53

Md. Code, Lab. & Empl. § 3-415 ............................................50

Md. Code, Lab. & Empl. § 3-415(c)(1) ...................................51

Md. Code, Lab. & Empl. § 3-420 ............................................50

Md. Code, Lab. & Empl. § 3-503 ............................................54

N.J.S.A. 34:11–4.4....................................................................66

N.J.S.A. 43:21–19(i)(6)(B) ................................................................59

N.J. Stat. Ann. § 34:11-56a4 .......................................................63, 64

N.J. Stat. Ann. § 43:21–19(i)(6) ..................................................56, 61

New Jersey Wage and Hour Law.......................................55, 63, 64, 66

New Jersey Wage Payment Law.......................................28, 55, 65

Pennsylvania Minimum Wage Act ......................32, 33, 34, 35, 36, 37, 38, 40

Pennsylvania Wage Payment Collection Law ...................28, 37, 41, 44, 45

SAFETEA-LU Technical Corrections Act of 2008, 49 U.S.C. § 13102, Pub. L. No. 110-244, § 305(c)................................................................38

## Other Authorities

29 C.F.R. § 541.500(a)................................................................64

29 C.F.R. § 541.504(a)................................................................64

29 C.F.R. § 541.504(b)................................................................64

34 Pa. Code § 9.1 ................................................................46

34 Pa. Code § 231.43(7)(b)................................................................36

34 Pa. Code § 231.85 ................................................................40

Local Rule 7.1(f)................................................................66

N.J. Admin. Code 12:56-7.1 ................................................................64

N.J. Admin. Code 12:56-7.2 ................................................................64

Rule 23 ................................................1, 23, 26, 27, 28, 29, 30, 32, 34, 40, 46, 50, 53, 55

Rule 23(a)................................................................2, 23

Rule 23(a)(2)................................................................23

Rule 23(b)................................................................23

Rule 23 (b)(2)................................................................2, 24, 25, 26

Rule 23(b)(3)................................................................2, 4, 24, 26

**TABLE OF EXHIBITS TO**
**MEMORANDUM OF DEFENDANTS FLOWERS FOODS, INC.**
**AND FLOWERS MAKING CO. OF OXFORD, INC.**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

| EXHIBIT | DESCRIPTION | BATES LABEL |
|---|---|---|
| A | Declaration of Christopher E. Humber | |
| A1 | Sample Distributor Agreement (Kenneth Castleberry) | OXF00805953 – OXF00805978 |
| A2 | Excerpts from Deposition of Kenneth Castleberry, taken January 30, 2018 | |
| A3 | Excerpts from Deposition of Richard Pellettiere, taken January 24, 2018 | |
| A4 | Excerpts from Deposition of Matthew Dyson, taken March 29, 2018 | |
| A5 | Excerpts from Deposition of Charles Palmer Rich, taken June 23, 2017 | |
| A6 | Excerpts from Deposition of Vincent DeCarlo, taken February 7, 2018 | |
| A7 | Excerpts from Deposition of Michael Jankowski, taken January 22, 2018 | |
| A8 | Excerpts from Deposition of Naftale Green, taken March 9, 2018 | |
| A9 | Excerpts from Deposition of  Michael Sisk, taken January 24, 2018 | |
| A10 | Excerpts from Deposition of Matthew Carr, taken August 9, 2016 | |
| A11 | Excerpts from Deposition of Augustine Oduro, taken July 18, 2018 | |
| A12 | Excerpts from Deposition of Luke Boulange, taken January 29, 2018 | |
| A13 | Excerpts from Deposition of Che Alexander, taken February 21, 2018 | |
| A14 | Excerpts from Deposition of Maldonado Daley, taken March 16, 2018 | |
| A15 | Excerpts from Deposition of Christian Barra Valdez, taken March 4, 2018 | |
| A16 | Excerpts from Deposition of James Walls, taken January 23, 2018 | |
| A17 | Excerpts from Deposition of Terry Carr, taken May 24, 2016 | |
| A18 | Excerpts from Deposition of James Checca, taken May 26, 2016. | |

| A19 | Excerpts from Deposition of Matthew Monteith, taken February 7, 2018 | |
| A20 | Excerpts from Deposition of Joan Carlo Barra, taken March 14, 2018 | |
| A21 | Excerpts from Deposition of Gregory Scott Brown, taken May 25, 2016 | |
| A22 | Excerpts from Deposition of Jerry Gilbert, taken May 18, 2017 | |
| A23 | Excerpts from Deposition of Joseph Anthony Alvarez, taken January 19, 2018 | |
| A24 | Excerpts from Deposition of Jonathan Haney, taken February 13, 2018 | |
| A25 | Excerpts from Deposition of David Tumblin, taken May 25, 2016 | |
| A26 | Excerpts from Deposition of Michael Bolognese, taken February 21, 2018 | |
| A27 | Excerpts from Deposition of Paul Milazzo, taken March 10, 2017 | |
| A28 | Excerpts from Deposition of James Hampton, taken July 21, 2014 | |
| A29 | Excerpts from Deposition of Anthony DiMemmo, taken March 29, 2018 | |
| A30 | Email correspondence regarding Daniel Cush | OXF00214526 – OXF00214529 |
| A31 | Excerpts from Deposition of Michael Beese, taken January 22, 2018 | |
| A32 | Excerpts from Deposition of Charles Palmer Rich, taken November 29, 2017 | |
| A33 | Chart of Contract Differences | |
| A34 | Account Mix Charts (Graphs 1-4) | |
| A35 | James Checca Distributor Agreement | |
| A36 | Luke Boulange Distributor Agreement | OXF00605653 – OXF00605681 |
| A37 | Joan Carlo Barra Authorization | OXF00807363 – OXF00807500 |
| A38 | Michael Beese Authorization | OXF00808389 – OXF00808515 |
| A39 | Kenneth Castleberry Authorization | OXF00805862 – OXF00805982 |
| A40 | Matthew Dyson Authorization | OXF00808798 – OXF00808984 |
| A41 | Michael Jankowski Authorization | OXF00809146 – OXF00809273 |

| A42 | David Tumblin Authorization | OXF00000012 – OXF00000135 |
|---|---|---|
| A43 | James Walls Authorization | OXF00800688 – OXF00800905 |
| A44 | Distributor Agreement with SCM Medrano Distribution Corp. (Mar. 19, 2018) | OXF01725722 – OXF01725757 |
| A45 | Maldonado Daley Authorizations | |
| B | Declaration of Jason LaClair | |
| C | Declaration of Richard Pellettiere | |
| D | Declaration of John Reaves | |
| E | Declaration of Alfred Steinheimer | |
| F | Declaration of Leroy Stewart | |
| G | Declaration of Jason Torgerson | |
| H | Declaration of Jason LaClair | |
| I | Declaration of Alan Ferranti | |

# I.    INTRODUCTION

Plaintiffs in these consolidated actions are current and former independent distributors who purchased the exclusive rights to distribute Defendants' baked goods within certain defined geographic territories served by Defendant Flowers Baking Co. of Oxford, Inc. ("Oxford"), a subsidiary of Defendant Flowers Foods, Inc. ("Flowers").[1]  Alleging they were misclassified as independent contractors, Plaintiffs claim they were denied overtime premium pay and subjected to unlawful deductions in violation of Pennsylvania, Maryland, and New Jersey wage and hour laws.    Plaintiffs seek Rule 23 certification of three state law classes consisting of "persons who [during the relevant limitations period] worked as distributors for [Flowers] and/or [Oxford] in [Pennsylvania, Maryland, or New Jersey] and were classified as independent contractors under their distribution agreements."   Pls.' Mot. for Class Certification ("Pls.' Mot.") (Doc. 262).[2] Defendants now oppose that motion.

Plaintiffs attempt to weave a tale of Defendants' "comprehensive management structure" and the alleged top-down policies and practices Defendants purportedly use to "control" distributors, but the record in this case tells a different story.  Oxford's independent distributors have offered dramatically inconsistent or contradictory deposition testimony with respect to numerous evidentiary issues central to any determination of liability on their state law claims, with the result that common issues of law or fact cannot be said to predominate over individualized issues among the members of any putative class.  Plaintiffs deal with this evidence in perhaps the only way they can—by ignoring it.  Their brief does not contain a *single citation* to deposition testimony provided by independent distributors other than the Named Plaintiffs, likely because

---

[1] Plaintiffs have elected not to move for certification of a Rule 23 class with respect to Plaintiff Checca's claims under New York wage and hour law.

[2] Unless stated otherwise, all citations to the record in these consolidated cases will be to docket entries in *Carr et al. v. Flowers Foods, Inc. et al.*, No. 15-cv-6391 (E.D. Pa.).

that individualized testimony makes clear that Plaintiffs cannot establish class-wide liability through representative evidence.  Plaintiffs make no effort to organize the evidence in this case by state, and in fact rely extensively on evidence that is irrelevant to *any* of Oxford's operations or to the Plaintiffs in this case—more than 25 of the 80 exhibits to their brief are documents or testimony from cases against Flowers-affiliated bakeries *other* than Oxford.  And despite taking all these liberties with the record, Plaintiffs still apparently found it necessary to load up their brief with gross misrepresentations of the evidence they actually do cite.

Ultimately, Plaintiffs cannot meet their burden of demonstrating that a class action is the superior method for adjudicating any of the state law claims in this matter.  Plaintiffs cannot identify any final injunctive or declaratory relief that is appropriate respecting any class as a whole, as required for certification under Rule 23 (b)(2).  Given complicated multijurisdictional choice of law issues in this case, Plaintiffs cannot identify a reliable, administrative feasible means to accurately ascertain class membership as required by Rule 23(b)(3).  Plaintiffs cannot establish common issues of law and fact with respect to liability as required by Rule 23(a), nor show that common issues predominate over individual issues as required by Rule (b)(3).  Ultimately, any attempt to determine liability based on "common proof" at trial would unfairly prejudice Defendants and violate their due process right to present contradictory individualized evidence relevant to particular class members.  For all of these reasons, class certification is not warranted and Plaintiffs' motion should be denied.

## II.   FACTUAL BACKGROUND

As a threshold matter, Plaintiffs' Motion for Class Certification is riddled with factual assertions that blatantly misrepresent the record.  Many of Plaintiffs' claims are either unsupported or directly contradicted by the cited evidence.  Defendants have attempted to highlight the most

egregious misrepresentations and misleading statements in Plaintiffs' Motion, but nonetheless urge the Court to give careful scrutiny to Plaintiffs' record citations before relying on any of their allegations as fact. Overall, the actual experiences of the distributors Plaintiffs seek to group into classes is markedly different from the picture that Plaintiffs try to paint in their Motion.

Additionally, Plaintiffs have made no attempt to organize their evidence by state or otherwise present state-specific evidence, as Defendants have done in the Argument section of this memorandum. In effect, Plaintiffs are hoping the Court will simply assume that their cited evidence applies across the board to independent distributors within each of the putative state law classes. To the extent possible, Defendants point out in this memorandum where jurisdiction-specific evidence contradicts Plaintiffs' narrative. As is evident from the factual overview below, however, there is precious little "representative evidence" regarding virtually any facet of the Oxford independent distributor experience that may be relevant to the legal issues in this case.

**A.  Overview of Defendants' Distribution System.**

In addition to its manufacturing operations, the Oxford bakery contracts with independent distributors who sell and deliver fresh-baked products to the market pursuant to a direct-store-delivery ("DSD") system.[3] Under this model, independent distributors purchase the rights to sell certain products within a defined geographical area pursuant to the terms of a Distributor Agreement.[4] Distributors purchase certain products from the bakery at a specified discount from the suggested wholesale price, then sell those products to customers within their territories.[5] The difference between the price at which distributors purchase products from Oxford and the price at

---

[3] Ex. B, LaClair 10/5/18 Decl. ¶ 3.
[4] *Id.*
[5] *Id.* ¶ 4.

which they sell it to their customers, less business expenses, represents profit to the distributor.[6]

Oxford operates 25 warehouses in the states of Pennsylvania, New York, New Jersey, Maryland,

and Virginia, and 22 of those warehouses have independent distributors.[7]  An Area Sales Director

("Sales Director") is responsible for each warehouse.[8]

> ### 1. The Distributor Agreement Does Not Create a Regime of Uniform Control Over Distributors.

Plaintiffs seek to characterize the Distributor Agreements as a means by which Defendants

control the distributors.   But the Distributor Agreement in fact grants significant rights to

distributors and contains numerous indicia of independent contractor status, including for example:

(1) the right to control the manner, method, and means of performance (Ex. A1, Sample Distributor

Agreement § 16.1), (2) the intent to perform services as an independent contractor (*id*.);

(3) ownership of exclusive distribution rights (*id*. at §§ 2.4, 3.1, 3.2); (4) the right not to service

the territory personally, and freedom to engage other individuals to do so (*id*. at § 16.3),

(5) responsibility for acquiring and maintaining delivery vehicles, equipment, and insurance (*id*.

at §§ 9.1, 9.2); (6) responsibility for risk of loss of product once acquired (*id*. at § 4.1);

(7) responsibility for the collection of all cash sales in the territory (*id*. at § 8.3); (8) the ability to

own and operate outside businesses and carry non-competing products (*id*. at §§ 5.1, 16.1); and

(9) the ability to buy and sell all distribution rights (*id*. at § 15.1).[9]   Contrary to Plaintiffs'

representation that the relationship can be terminated by Defendants at any time in their sole

---

[6] *Id.*

[7] *Id.* ¶ 6.

[8] *Id.*  Prior to January 2018, Area Sales Directors were called Branch Sales Managers, but their job duties were essentially the same.  To avoid confusion, this brief uses the term "Sales Director" in place of Branch Sales Manager, sales manager, or warehouse manager.

[9] By virtue of Oxford's unique history and the passage of time, Plaintiffs' Distributor Agreements are *not* identical in all material respects.  *See* Ex. A33 (Summary of Selected Contract Differences).

discretion, these distribution rights may not be terminated or cancelled by Defendants so long as the distributor remains in compliance with the terms of the Distributor Agreement—an utterly common term of any contractual relationship. *Id*. at § 17.1.[10]

Plaintiffs argue that Defendants control independent distributors by issuing breach letters to those who fail to comply with the contractual obligation to use their "best efforts" to follow with "good industry practice." Plaintiffs suggest that Oxford has the exclusive and unreviewable authority to define what constitutes "good industry practice," but this is not the case. The term is defined with reference to objective legal requirements and "standards that have developed and are generally accepted and followed in the baking industry."[11] If a distributor disagrees with Oxford's interpretation of the term in any given instance, he has the contractual right to charge Oxford with a breach of the Distributor Agreement and ultimately seek redress in the courts.[12] Moreover, the very deposition testimony cited by Plaintiffs confirms that the issuance of breach letters is a decentralized process that typical originates with local bakery personnel and depends on the circumstances of each case.[13] Consequently, the frequency with which distributors receive breach letters and the reasons for those letters vary widely. Some distributors have never received a breach letter,[14] and others have received a number of them for widely varying reasons.[15]

---

[10] Several Plaintiffs have admitted that Oxford can only terminate their agreement with cause. *See, e.g.,* Ex. A3, Pellettiere Dep. 172:21-173:11; Ex. A4, Dyson Dep. at 80:4-10.

[11] Ex. A1, Sample Agreement § 2.6.

[12] *Id*. at §§ 18 (Dispute Resolution), 21.2 (Company Breach).

[13] *See* Ex. A32, Rich. 11/29/17 Dep. at 54:11-19 ("good industry practice is going to vary from distributor to distributor, situation to situation, because all those situations are different"); Ex. A5, Rich 6/23/17 Dep. at 51:20-24 (issuance of breach letters is "not automatic[]").

[14] *See, e.g.,* Ex. A6, DeCarlo Dep. at 139:7-17; Ex. A3, Pellettiere Dep. at 173:12-13; Ex. A7, Jankowski Dep. at 50:14-17.

[15] *See* Ex. A8, Green Dep. at 98:4-113:8,120:9-121:9 (he received multiple breach letters for such things as fighting with a driver from another company, getting barred from a store by a customer, and failing to make a payment due to Oxford); Ex. A9, Sisk Dep. at 88:7-21 (he has received four or five breach letters, and has been threatened with more, for such things as not rotating bread or using the wrong color ties).

2.       **The National Accounts and Field Marketing Teams do Not Create a Regime of Uniform Control over Distributors.**

Plaintiffs devote pages of their brief to discussing Defendants' management of national customer accounts, but this evidence ultimately underscores the reasons why the central issue in this case—independent contractor status—cannot be resolved through representative evidence applicable to all class members.  Plaintiffs concede that national and other chain retailers and foodservice customers "demand economies of scale and sophistication in marketing, pricing, and product selection that individual Distributors cannot provide" and demand "one point of contact" with their bakery suppliers.  (Doc. 262-1, pp. 2, 5.)[16] They argue that the growth of national retail accounts and the corresponding development of centralized sales organizations within large producers such as Flowers Foods have narrowed the entrepreneurial opportunities available to independent bread distributors to the point where they have ceased to function as independent business owners.  But Plaintiffs' argument ignores two important facts.  First, the concentration of national and chain accounts varies by geography, so the industry trend at the heart of Plaintiffs' theory of the case impacts individual distributors differently depending on where their territories are located.[17]  Second, as described in more detail in Section II.B., *infra*, individual distributors still describe vastly different experiences with respect to the existence and types of control purportedly exerted by the Defendants, and they take advantage of the entrepreneurial

---

[16] Distributors contract to designate Defendants as their agent for the sole purpose of engaging in authorization discussions with national and other chain accounts with regard to pricing and product placement. *See* Ex. A1, Sample Distributor Agreement, at § 6.1. Contracting with Defendants is what allows distributors' businesses to access the significant sales opportunities at these chain accounts.
[17] Ex. A34 (Graphs summarizing variation in cash sales in selected accounts).

opportunities available to them in very different ways.[18]   Consequently, Defendants' national accounts sales organization does not result in "uniform control" over distributors.

**B.      Distributors are Not Subject to Uniform "Controls" and, to the Contrary, Choose to Operate Their Businesses in Very Different Ways.**

The actual experiences of distributors and the way they operate their businesses and interact with Defendants demonstrates a vast disparity among the putative class that precludes class certification.   Plaintiffs attempt to assert sweeping generalizations about the treatment of distributors by citing predominately to testimony from Defendants' corporate management, picked from a variety of other cases across the country being pursued by Plaintiffs' counsel and discussing matters unrelated to the operation of Oxford or to independent distributors in Maryland, Pennsylvania, or New Jersey.   Indeed, Plaintiffs barely discuss the circumstances and treatment of the actual current and former distributors they seek to bind together into classes seeking common relief. The evidence below demonstrates the myriad differences among the distributors that Plaintiffs seek to represent with alleged "common" evidence.

**1.      Much of the "Control" Alleged by Plaintiffs is Dictated by Customer Service Requirements.**

Plaintiffs concede that independent distributors must adhere to customer service requirements regarding such things as product selection and quantity, placement, pricing, delivery times, and service standards.   Implicitly recognizing that such third party controls are irrelevant to the independent contractor analysis, however, Plaintiffs claim that these requirements "often

---

[18] Plaintiffs claim that Defendants' managers "create policies and procedures that Distributors must follow to perform their work to Flowers' satisfaction."  Pls.' Mot. (Doc. 262-1), p. 5 (citing Pls.' Exs. 31-33).  The evidence cited by Plaintiffs provides absolutely no support this proposition.

7

emanate from Flowers."  (Doc. 262-1, p. 12.)  But the record does not support this contention.[19]

At times, Flowers at times has encouraged and assisted its national accounts to set down their *own*

service preferences in writing, an obvious means to prevent the sort of misunderstandings and

service failures that can result from unstated or unclear expectations.  Plaintiffs cite absolutely no

evidence that Defendants have created—as opposed to merely recorded—a customer's service

requirements where none otherwise existed.[20]  Nor have Plaintiffs offered any evidence regarding

the frequency with which Flowers assists customers in recording their service expectations.

Although several distributors professed to be unaware of who originates customer service

requirements, some acknowledged that they do in fact come from the customers themselves.[21]

Plaintiffs erroneously assert that "Defendants' major customers generate largely identical

[service] requirements."  Doc. 262-1, p. 13.  Even though Defendants produced in discovery *all* of

the customer service requirements in use at the Oxford bakery, Plaintiffs cite absolutely no

evidence from the Oxford bakery to support this claim.[22]  The fact is that Oxford's major customers

do not have "largely identical" service requirements.[23]  Not all customers even have service

requirements, and of course not all Oxford distributors have the same customers.[24]  Consequently,

---

[19] Plaintiffs cite deposition testimony from Charles Rich that was given in another case and does not relate specifically to the Oxford bakery, and nothing in Mr. Rich's testimony indicates that customer service requirements at any bakery "often emanate from Flowers."

[20] *See, e.g.*, Ex. A32, Rich 11/29/17 Dep. at 29 (explaining that goal is to make distributors and sales managers aware of the customers' service requirements).

[21] *See, e.g.,* Ex. A2, Castleberry Dep. at 199:8-12 (testifying that services windows are "entirely dictated on—by the customer").

[22] Although Defendants have produced all the customer service requirements in use at Oxford, Plaintiffs have not cited *any* of this evidence in their brief.  Bizarrely, their argument rests exclusively on evidence that two customers of the Holsum bakery in Arizona—Basha's and Wendy's—have similar, but not identical, service requirements.  That evidence is irrelevant because Oxford's independent contractors do not service Basha's or Wendy's.  Basha's is a regional account in Arizona with no presence on the East Coast, and Wendy's franchisees in the Oxford area purchase frozen bread.  Ex. H, LaClair 11/29/18 Decl. ¶ 8.

[23] *Compare* Ex. A10, M. Carr Dep. Ex. 5 (Target and Ahold); Ex. A11, Oduro Dep. Exhibits 29-30 (Burger King, Shoppers).

[24] Ex. A12, Boulange Dep. at 198:19-24 (admitting that not all of his customers have customer service windows); Ex. A2, Castleberry Dep. at 122:19-123:125 (not all of his customers had service windows).

even if Plaintiffs could show that Defendants themselves were responsible for creating the service requirements used by Oxford customers (which Defendants emphatically deny), this still would not support class certification because these requirements do not impact all independent distributors the same way.

### 2. Distributors are Not Required to Service Their Territories Personally and are Free to Engage in Non-Competitive Work.

The strongest evidence of Defendants' lack of control lies in the fact that distributors are not *personally* obligated to fulfill their duties under the Distributor Agreement. They are free to hire their own employees or helpers and to set the terms of that relationship.[25] Some distributors never employed a helper, while others employed full-time helpers on a long-term basis.[26] Plaintiffs who choose to hire helpers do so for various purposes and to varying degrees. For example, Plaintiff Dyson hired someone to restock shelves "maybe once every couple of months,"[27] whereas Plaintiff Oduro paid an employee at $700 per week to service his territory for more than a year while he lived in Africa and worked for other companies.[28] Distributors who hire their own employees demonstrate considerable independence and skill in the management of their workforces, in contrast to those distributors who simply operate their territories alone.

All independent distributors are contractually permitted to own and operate outside businesses and carry non-competing products, but the extent to which they take advantage of this

---

[25] Ex. A1, Sample Distributor Agreement § 16.2 ("DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR's responsibilities hereunder.").

[26] *Compare* Ex. A7, Jankowski Dep. at 98:17-98:19 (he never hired any helpers to assist in his distributorship) *with* Ex. A13, Alexander Dep. at 44:22-45:21, 48:5-48:9 (he employs two people through his corporation to operate his route, and he pays them $625 a week in cash "off the books").

[27] Ex. A4, Dyson Dep. at 61:20-62:1.

[28] Ex. A11, Oduro Dep. at 39:15-22; 41:24-43:16. *See also* Ex. A14, Daley Dep. at 57:19-60:2, 89:22-92:13 (he hired an employee to service his accounts twice a week, to shorten his workday); Ex. A9, Sisk Dep. at 37:7-38:10 (he employs a helper to assist him with deliveries for 25 hours a week, five days a week, at $50 a day); Ex. A15, Valdez Dep. at 110:4-112:24 (Valdez hired a helper one time to cover his route for two days when he needed some time off).

opportunity varies.[29]  Some Plaintiffs distribute non-competing products or pursue other business

activities in conjunction with their distribution of Flowers products.  For example:

- Plaintiff Michael Sisk testified that he works as a route driver for Martin's, one of Oxford's direct competitors.  He delivers Martin's products five days a week to 13 accounts outside his Oxford territory at the same time his employee delivers Flowers products inside his Oxford territory.  Ex. A9, Sisk Dep. at 34:9-38:16.

- Plaintiff James Walls spends two hours a day entering invoices, selling, and placing orders for his coffee business.  Ex. A16, Walls Dep. at 32:21-33:6.

- Plaintiff Terry Carr co-owns a business with his daughter called Direct Ship Chips & More, and his role is to transport chips to the house and post office.  Ex. A17, T. Carr Dep. at 425:14-19, 427:21-24, 429:2-4.

- Plaintiff Che Alexander is currently a distributor with multiple routes, but he is also a partner at FedEx Ground.  Ex. A13, Alexander Dep. at 26:10-11.

Plaintiff Dyson, by contrast, believes that selling non-competitive products is prohibited.[30]

Plaintiff Checca thinks he can sell non-competing products in his territory, so long as he does not

sell too much.[31]  Plaintiff DeCarlo understands that he can operate non-competing businesses, but

he simply chooses not do so.[32]

### 3.    Distributors are Not Subject to Uniform Control with Respect to Scheduling.

Plaintiffs allege that they are required to deliver product to customers "at the time and place

specified by Defendants."[33]  But the evidence demonstrates that distributors' experiences vary

dramatically on their scheduling.  Some distributors testified that Oxford controlled their daily

---

[29] Ex. A1, Sample Distributor Agreement §§ 5.1, 16.1.

[30] Ex. A4, Dyson Dep. at 40:3-40:9 (he could not "carry other items on [his] truck. Like I couldn't distribute candy off the back of the truck or something like that.").

[31] Ex. A18, Checca Dep. at 230:14-232:9.

[32] Ex. A6, DeCarlo Dep. at 71:22-72:3.

[33] Am. Compl. (Doc. 52), at ¶ 21; Plfs' Mot. (Doc. 262-1) at p. 3 (Plaintiffs allege that distributors "must follow the customer service requirements that Flowers and the retailer agree upon, such as delivering products a certain number of times per week and during certain times of the day," but this assertion is not supported by the cited testimony).

schedules, whereas others denied that they were ever given schedules.[34]   According to Plaintiff Daley, his Sales Director told him the order in which to service his accounts, and he followed that order even though he felt it did not make sense.[35]   By contrast, Plaintiff Sisk testified that the "only freedom" he had was the order of servicing his accounts.[36]   Others explained that their route sequences were determined by customer delivery windows, which varied from one customer to the next.[37]   Some distributors testified that their Sales Directors forced them to make extra customer deliveries (known as "call-backs") against their objections, whereas others denied this ever happened to them.[38]   Plaintiffs Monteith and Valdez testified that Oxford managers controlled their break times,[39] but Plaintiff Matthew Carr considered discretionary breaks to be a positive aspect of his job and once told a prospective buyer, "[If] you don't want to work, sit here, don't do nothing."[40]

---

[34] *Compare* Ex. A19, Monteith Dep. at 62:22-63:5 (Sales Directors gave him a written schedule to follow); Ex. A14, Daley Dep. at 62:10-63:24 (Oxford controlled the logistics of his route), *with* Ex. A7, Jankowski Dep. at 74:25-75:8 (he was never given a schedule of hours to work, and his hours varied from one day to the next); Ex. A4, Dyson Dep. at 56:1-14 (Oxford did not give him a schedule of hours to work each day).

[35] Ex. A14, Daley Dep. at 41:14-42:21.  *See also* Ex. A20, Barra Dep. at 93:2-96:4 (he follows a specific order that his Sales Director suggested and he thinks he would get in trouble otherwise).

[36] Ex. A9, Sisk Dep. at 80:21-81:5.  *See also* Ex. A7, Jankowski Dep. at 78:18-78:23 (he determined the order in which he serviced his customers); 80:11-80:18 (he did not get in trouble for deviating from his set route, and Oxford did not monitor what route he took).

[37] Ex. A18, Checca Dep. at 218:11-220:7 (admitting that he can service his accounts in any order he wants so long as he meets customer-set delivery schedules); Ex. C, Pellettiere Decl. ¶ 34 (the order in which he services his customers depends largely on the receiving hours set by the customers); Ex. A13, Alexander Dep. at 57:9-57:16 (Oxford tells him to be at a store at a specific time, but that "generally will come from the store requesting them"); Ex. A21, Brown Dep. at 304:20-305:16 (admitting that delivery dates vary by customer).

[38] Compare Ex. A4, Dyson Dep. at 34:3-34:8 ("You were required to do call-backs later in the day in some accounts. And if you didn't, then you would receive a breach letter or some form of discipline."), with Ex. A13, Alexander Dep. at 106:9-106:16 (he was never contacted for call backs).

[39] See Ex. A19, Monteith Dep. at 72:23-73:4 (he needed to get his Sales Director's permission to leave his route for an emergency); Ex. A15, Valdez Dep. at 20:22-21:8 (Oxford controlled his breaks by requiring him to be at certain stores at certain times).

[40] Ex. A10, M. Carr Dep. at 181:20-182:3.

4.      **Distributors are Not Subject to Uniform Control with Respect to Promotions, Product Placement, and Displays.**

Plaintiffs assert that distributors are "required to cooperate with Oxford and Flowers with respect to product promotions," and the failure to do so can result in a breach.  Doc. 262-1, p. 14. Again, Plaintiffs misstate the evidence.  Distributors are only contractually required to adhere to promotions and feature pricing for their major and chain accounts; they have complete discretion whether to do so in their local accounts.[41]  Consequently, the extent to which promotional pricing represents a "control" on any given distributor depends on the mixture of accounts in his territory. In fact, the deposition testimony cited by Plaintiffs indicates that a distributor will "not necessarily" receive a breach letter for failing to follow a customer-wide promotional planner because local store managers may have discretion to depart from it.[42]  A distributor would only be subject to a breach letter from Defendants for failure to follow a customer's promotion if the customer "is requiring a certain item to be in the store and [the distributor does not] order it."[43]  Additionally, though Plaintiffs claim that "Distributors have no involvement in creating these promotions," their own evidence indicates otherwise.  Plaintiffs cite an email from Oxford Vice President Joe Alvarez indicating that distributors could be breached for failing to participate in a promotion of Wonder Italian bread, but his deposition testimony regarding this email describes how this promotion was based in part on input from distributors.[44]

Plaintiffs argue that they are required to stock shelves according to a "planogram" and that

---

[41] Ex. A1, Sample Agreement, § 13.2 ("DISTRIBUTOR will adhere to all promotions and feature pricing with respect to the major and Chain accounts in the Territory.  Such promotions and feature pricing are optional with respect to local accounts.").

[42] Rich 11/29/17 Dep. (Doc. 262-26, filed under seal) at 33:23-35:6.

[43] Ex. A22, Gilbert Dep. at 115:10-116:14; *see also* Ex. A32, Rich 11/29/17 Dep. at 36:4-25.

[44] Ex. A23, Alvarez Dep. at 152:18-153:13.

their failure to do so can result in a breach letter.[45]   However, the deposition testimony indicates that a distributor's real or perceived ability to deviate from planograms varies by distributor and by account.  Plaintiff Valdez testified that he could not deviate from the planogram and could not ask store managers for additional shelf space.[46]   Plaintiff Alexander, by contrast, testified that even in his national accounts, he is able to ask for additional space and sometimes get it.[47]   Plaintiff Castleberry acknowledged that some store managers enforce planograms more strictly than others.[48]   Plaintiff Walls and others admitted that they deviate from planograms even if they do not have permission to do so.[49]

Plaintiffs contend that Defendants control their use of special displays, endcaps, hutches, and the like.  Indeed, some distributors testified that Oxford requires them to set up displays, while others explained that they exercise discretion about whether to follow such instructions.[50]  Likewise, some distributors testified that they need permission from Oxford to add displays and end caps to their accounts, but others disagreed.[51]   Plaintiff Tumblin admitted that when he was a

---

[45] A "planogram" is a diagram that shows what products should be placed in given locations on a store shelf.  Ex. A24, Haney Dep. at 185:17-186:7.

[46] Ex. A15, Valdez Dep. at 173:8-174:2.  *See also* Ex. A19, Monteith Dep. at 112:14-115:16 (he received two breach letters for not following the planograms).

[47] Ex. A13, Alexander Dep. at 76:17-76:23.

[48] Ex. A2, Castleberry Dep. at 116:13-22.

[49] *See* Ex. A16, Walls Dep. at 112:9-112:12 (he has changed the product facings but "hoped [he] never got caught"); Ex. A19, Monteith Dep. at 123:24-124:13 (he does not always follow his planograms); Ex. A9, Sisk Dep. at 96:3-96:11 (he sometimes deviates from his planograms to change product facings); Ex. A8, Green Dep. at 50:5-20 (he obtained permission from local store manager at Wal-Mart to add product to his shelves, but Oxford Sales Directors made him remove it when they found out).

[50] *Compare* Ex. A12, Boulange Dep. at 130:22-131:12 ("Flowers usually dictated when we were to put up displays and things like that."), *with* Ex. A17, T. Carr Dep. at 378:23-379:8 (sometimes he complied with Flowers' request to set up displays, sometimes not); Ex. A20, Barra Dep. at 57:4-63:2 (he refused to put up a display that Oxford had requested); Ex. A4, Dyson Dep. at 43:1-43:14 (describing the frequency with which he refused to put up requested displays as "a lot").

[51] *Compare* Ex. A15, Valdez Dep. at 175:9-177:8 (Oxford determines when displays are to be put up and whether to use end caps), *with* Ex. A12, Boulange Dep. at 145:15-145:20 (distributors can ask store managers for displays even when Oxford did not tell them to do so); Ex. A7, Jankowski Dep. at 68:23-69:7 (Oxford encouraged him to seek displays, but it ultimately was his choice).

13

Sales Director, he required some distributors, but not others, to set up displays.[52]

### 5.    Not All Distributors Are Subject to the Same Degree of Oversight by Sales Directors.

Plaintiffs claim that Sales Directors are "required as part of their ordinary duties" to perform store visits to ensure that Distributors are following planograms, removed out-of-code product, placing displays, and otherwise meeting service expectations.  Plaintiffs cite no evidence that these store checks are "required" for all accounts or how often they occur.  To the contrary, their evidence indicates that these checks are customer-driven because they most commonly are triggered by customer requests for improved service.[53]  Plaintiffs concede that Sales Directors have a good deal of discretion to decide how to respond when distributors are not meeting customer service expectations.

Indeed, Plaintiffs have offered widely divergent testimony about the extent to which Sales Directors seek to control various aspects of their businesses.  For example, Plaintiff Daley testified that Sales Directors would ride along with independent distributors on their routes in order to make sure they were complying with the "Flowers way" of doing things,[54] whereas others testified that they never had a ride-along after becoming an independent distributor.[55]  Likewise, the frequency with which Sales Directors visit distributors in the field varies according to the distributor[56] and

---

[52] Ex. A17, T. Carr Dep. at 376:18-379:8 (as Sales Director at Frederick, Tumblin told Terry Carr to set up a display); Ex. A25, Tumblin Dep. at 243:15-25 (he never forced distributor Joe Mensch to take displays to his accounts).

[53] Ex. A24, Haney Dep. at 104:13-20.

[54] Ex. A14, Daley Dep. at 107:3-107:19.  The frequency of these ride-alongs varies considerably depending on the distributor and Sales Director involved.  *See* Ex. A19, Monteith Dep. at 122:17-122:20 (only one time); Ex. A4, Dyson Dep. at 96:22-97:18 ("[m]aybe once a year"); Ex. A13, Alexander Dep. at 148:24-149:6 (every other month).

[55] *See, e.g.,* Ex. A26, Bolognese Dep. at 172:13-173:2; Ex. A6, DeCarlo Dep. at 145:21-147:2; Ex. A3, Pellettiere Dep. at 187:3-187:18; Ex. A16, Walls Dep. at 169:6-169:13.

[56] *Compare* Ex. A7, Jankowski Dep. at 123:15-123:20 (he was visited a couple of times a week), *with* Ex. A3, Pellettiere Dep. at 187:19-188:11 (he was visited only "once or twice a year").

14

Sales Director involved.[57]  Some Plaintiffs testified that they received period evaluations from

their Sales Directors,[58] whereas others testified to the contrary.[59]

### 6.      Distributors are Not Subject to Uniform Control with Respect to Ordering.

Plaintiffs contend that Oxford "effectively controls" the type and quantity of products

ordered by independent distributors, but the evidence indicates that distributors have considerable

leeway to apply their own entrepreneurial skill to the ordering process and that they exercise this

discretion in very different ways.  Distributors order products for their customers using a handheld

electronic device that provides suggested orders based on historical sales information.[60]  Plaintiffs

assert that "Oxford frequently admonish [sic] Distributors for not following suggested orders"

(Doc. 262-1, p. 24), but their cited evidence does not support this proposition.[61]  Whereas all

distributors have the right to adjust suggested orders, the extent to which they do so in practice

varies considerably.  For example, Plaintiff Bolognese testified that "nobody uses the suggested

order because it's not right,"[62] but Plaintiff Monteith stated that he needs approval to change the

---

[57] *See* Ex. A19, Monteith Dep. at 128:8-129:8 (Sales Director Chris Novosel visited him 5 or 6 times, but Sales Director Jon Haney only visited him 2 or 3 times); Ex. A9, Sisk Dep. at 96:12-20, 140:3-140:21 (he received field visits from his former Sales Director, but none from his current Sales Director).

[58] See Ex. A15, Valdez Dep. at 179:12-180:12 (every quarter, he received feedback from the Sales Directors about how he was servicing and maintaining shelves in his accounts); Ex. A6, DeCarlo Dep. at 148:6-148:11 (Sales Directors told him how he was doing and made sure he was doing everything correctly).

[59] Ex. A14, Daley Dep. at 107:20-108:1 (he did not receive any performance evaluations); Ex. A20, Barra Dep. at 136:13-137:5 (never got a performance evaluation).

[60] Ex. A32, Rich 11/29/17 Dep. at 92:9-93:12.

[61] Plaintiffs cite deposition testimony that Paul Milazzo, Director of National Accounts for Flowers Foods, gave in another lawsuit against a different bakery (Lepage), and his testimony does not relate to practices at the Oxford bakery or the plaintiffs in this case.  Mr. Milazzo agreed that Lepage "encourages" distributors to follow suggested orders, but he never suggested that Lepage or any other Flowers-affiliated bakery "frequently admonishes" distributors for not following suggested orders.  Ex. A27, Milazzo Dep. (Doc. 262-19) at 162:24-163:1.  To the contrary, he explained that Lepage distributors *cannot* receive breach letters for ignoring suggested orders.  *Id.* at 164:18-25.

[62] Ex. A26, Bolognese Dep. at 161:22-23. *See also* Ex. A16, Walls Dep. at 194:3-194:12 (he "ignores" the suggested orders and "always" has to readjust them); Ex. A3, Pellettiere Dep. at 177:6-177:8 (he changes suggested orders "almost every day"); Ex. A17, T. Carr Dep. at 257:12-294:6 (he adjusts suggested orders based on knowledge of customers and sales patterns).

suggested orders and only does so once or twice a year.[63]  Plaintiffs Matthew and Terry Carr described how, over the objection of their Sales Managers, they routinely doubled their orders on Fridays so they would not have to pick up product at the warehouse on Saturdays.  Plaintiff Boulange, who worked with a different Sales Manager at a different warehouse, did not believe he could do this.[64]  Some distributors testified that they can control product selection and placement in their stores, while others claimed to have no control over product selection.[65]  Still others explained that their control over product selection depends on the type of account, such that they have more control in their independent and cash accounts.[66]

Plaintiffs contend that Oxford makes unilateral changes to their orders that they are required to accept, but here, too, the experience of individual distributors varies widely.  Plaintiff Bolognese testified that he tried to reject products but Oxford still "plussed" it to his orders, whereas Plaintiff Brown and others testified that they can reject product added to their orders.[67]  Plaintiff Tumblin admitted that when he worked as an Area Sales Manager, his practice of adding product to distributor orders varied by warehouse and distributor.[68]  For example, he sometimes

---

[63] *See* Ex. A19, Monteith Dep. at 91:10-21; *see also* Ex. A6, DeCarlo Dep. at 101:6-101:11 (he followed the suggested order on the handheld unless his manager instructed otherwise); Ex. A14, Daley Dep. at 102:10-105:20 (he always followed the suggested amount because if he did not, his order would be changed).

[64] *Compare* Ex. A17, T. Carr Dep. at 261:3-273:10, 317:4-318:16; Ex. A10, M. Carr Dep. at 261:1-262:19, *with* Ex. A12, Boulange Dep. at 190:8-190:22.

[65] *Compare* Ex. A17, T. Carr Dep. at 260:6-260:9 (he is free to add or subtract products going to his accounts), *with* Ex. A20, Barra Dep. at 175:15-175:22 (he has no control over product selection).

[66] Ex. A25, Tumblin Dep. at 445:18-21 (he cannot negotiate product selection in national accounts); Ex. A13, Alexander Dep. at 129:15-130:3 (he has to order certain products at chain stores, but not at independent stores).

[67] *Compare* Ex. A26, Bolognese Dep. at 169:7-169:14, *with* Ex. A21, Brown Dep. at 216:5-217:6, 221:13-222:13, 297:9-298:24 Ex. A17, T. Carr Dep. at 297:14-297:24 (when product was added to his load, he deleted it); Ex. A9, Sisk Dep. at 136:9-137:9 (managers tried to change his orders only a few times, and he was able to reject those changes); Ex. A18, Checca Dep. at 216:25- 217:16 (acknowledging he could reject product added to his order); Ex. A3, Pellettiere Dep. at 180:3-180:6 (if sales managers add product to his orders, he doesn't have to take it).

[68] Plaintiffs contend that Tumblin "required" distributors to accept product they did not want to take, but the cited evidence makes clear that Tumblin sought to persuade distributors to agree to accept product they did not want to take because he could not simply require them to accept it.  Ex. A25, Tumblin Dep. at 244:9-15 ("I can't say that I forced him to do so."), 26:6-10 ("He took the product so I—I assume that he agreed."); 264:16-24 ("He—he agreed to do

16

insisted that distributors at the York Springs warehouse take product that they did not order and did not want, but he never required distributors at the Frederick warehouse to accept product they did not order. [69]

### 7. Distributors are Not Subject to Uniform Control with Respect to Pricing and Margins.

Plaintiffs contend that Defendants exercise "nearly complete control" over the price at which products are sold to customers, but this overstates the evidence.[70]  Several distributors acknowledged that although they have no direct control over pricing for national and large chain accounts, they do have discretion to adjust pricing for smaller chain and "cash" accounts.[71] Consequently, a distributor's control over pricing depends on the mixture of accounts in his territory.  Plaintiffs point out that Distributors who choose to lower prices in their cash accounts may have to absorb the lost margin, but this is consistent with being an independent contractor and does not constitute a "control" over pricing by Oxford.  Plaintiffs also contend that Oxford hypothetically could issue a breach letter to a distributor who uses abusive pricing to drive away a cash customer (and there is no evidence this has ever occurred), but this reflects Oxford's interest in promoting the ultimate goal of customer satisfaction rather than any attempt to control the means by which distributors achieve that objective.[72]

---

that."); 276:23-277:5 ("I—I couldn't physically force him to take it."), 278:16-19 ("Again, I—I was able to get him to understand that he needed that product.").

[69] *Compare* Ex. A25, Tumblin Dep. at 246:11-249:17 (Frederick), *with* 263:10-14 (York Springs).

[70] Plaintiffs cite deposition testimony suggesting that this phenomenon ultimately is customer-driven.  *See* Ex. A28, Hampton Dep. at 31:18-32:12 (testimony by Flowers' Vice President of National Accounts that distributors "have the right as independent operators" to discuss pricing of new products with large chain accounts, but those accounts are unlikely to want to talk to individual distributors about product pricing).

[71] *See e.g.,* Ex. A29, DiMemmo Dep. 183:8-14 (acknowledging he set the price for his Dollar Store account.); Ex. C, Pellettiere Decl. ¶ 20 ("One time I changed the price on a product I sold to a cash account. I had some bread that I could not sell at another store so I sold it to Tiger Market at their lower private label price.").

[72] Plaintiffs also claim that distributors are paid "commissions," but they cite no evidence for this.  Distributors purchase product from Oxford at a discount below the wholesale price at which they sell the product to retailers, and the price difference or "margin" represents profit to the distributors.  Ex. B, LaClair 10/5/18 Decl. ¶ 3.

Plaintiffs argue that Oxford can "punish" distributors by withholding the "additional discounts" (extra margin) that it otherwise might provide in certain markets or on certain products. It makes little sense to describe the additional discount as a form of "control" because no distributor is contractually entitled to receive it. Moreover, the availability of these discounts, and their amount, varies by distributor, product, area, and time.[73] Some distributors never received an additional discount, making this form of alleged "control" irrelevant to their claims.[74] Some Plaintiffs were able to persuade their Sales Managers to provide them with additional discounts, while others claimed to have no control over the discounts.[75]

### 8. Distributors are Not Subject to Uniform Stale Relief Policies.

Plaintiffs claim that Oxford closely monitors and controls how much "stale" distributors bring back to the warehouse by "charging" them when they exceed a "stale cap" that is set by Oxford in its "sole discretion." As a threshold matter, Oxford does not *charge* distributors for stale product and does not *require* them to bring it back to the warehouse. Distributors can choose to sell stale product to other stale outlets (such as Family Dollar stores, jails, or farms) or transfer it to other distributors with stale outlets in their territories.[76] Distributors only need to bring stale product back to the warehouse if they want Oxford to buy it back from them, which Oxford has

---

[73] Ex. A15, Valdez Dep. at 140:16-23 (additional discount has changed over time and varies by product); Ex. A2, Castleberry Dep. at 75:13-76:15 (additional discount varied by brand and changed over time); Ex. A12, Boulange Dep. at 226:25-227:24 (additional discount varied by territory and distributor); 277:9-21 (Oxford managers "changed additional discount for different distributors at different times for different reasons"); Ex. A10, M. Carr Dep. at 146:20-147:11 (the distributor allowance is route-specific).

[74] Ex. A21, Brown Dep. at 307:6-308:2 (he has never received a temporary allowance).

[75] *Compare* Ex. A20, Barra Dep. at 167:25-168:12 (Flowers did not consult Barra on allowances and discounts that resulted in Barra making less money. Barra did not have any say in discounts or adjustments that Flowers gave to its customers.); Ex. A15, Valdez Dep. at 141:2-4 (he has never tried to get more additional discount), *with* Ex. A30, OXF00214526-529 (documenting opt-in Plaintiff Daniel Cush's efforts to increase his additional discount through negotiation with Oxford management).

[76] Ex. B, LaClair 10/5/18 Decl. ¶¶ 11-12.

no obligation to do.[77]  Consistent with transactions between business partners, Oxford often limits the amount of stale product that it repurchases, and these "stale caps" vary by time, warehouse, and even product type.[78]  Some distributors testified that they have *never* been subject to a "stale cap."[79]  Plaintiff Boulange testified that even though all of the distributors in his warehouse theoretically were subject to the same stale cap, it was applied differently against different distributors.[80]  To the extent Plaintiffs believe that Oxford's stale relief policies are relevant to the independent contractor analysis, they cannot demonstrate the impact of those policies through common evidence applicable to each class as a whole.

### 9.  Distributors are Not Subject to Uniform Control with Respect to Territory Sales.

Plaintiffs concede that distributors can sell or transfer their distribution rights to third parties at any price agreed upon by the buyer and seller, but they contend that Oxford nevertheless "controls" these sales by exercising "sole discretion" to determine whether someone is a qualified buyer or transferee.  Plaintiffs misstate the evidence.  Oxford does have the contractual right to approve third party sales, but its discretion is not unfettered.  The Distributor Agreement expressly states that Oxford's approval of third party sales and transfers "shall not be unreasonably

---

[77] Ex. A12, Boulange Dep. at 199:17-200:10, 203:23-205:7 (he decides whether to sell stale back to bakery or to the stale outlet in his territory); Ex. A21, Brown Dep. at 69:19-25, 233:15-234:10 (he must bring back stale product to the warehouse if he wants Oxford to credit him for it)

[78] Ex. A24, Haney Dep. at 284:1-23 (describing recent increase in stale cap in his area); Ex. A21, Brown Dep. at 70:16-73:6, 234:5-18 (Oxford pays full credit for stale returns up to 10% of weekly gross sales and 50% for returns over that amount), 72:13-20 (Oxford can "raise or lower" this cap, and the 10% stale cap in his area was higher when he started); Ex. A19, Monteith Dep. at 88:2-7 (he was always subject to a 15% stale cap); Ex. A15, Valdez Dep. at 91:7-93:25 (currently on a stale cap of 15% per week, but that has changed over time, and he had a choice to select a stale cap by class of product); Ex. A8, Green Dep. at 77:18-78:7 (he was not subject to a stale cap until 2014); Ex. A4, Dyson Dep. at 67:21-24 (stale cap changed over time).

[79] *See* Ex. A18, Checca Dep. at 153:14-154:9, 228:17-24 (Checca had never been subject to a stale cap); Ex. A16, Walls Dep. at 133:13-14 (he was never on a stale cap).

[80] Ex. A12, Boulange Dep. at 213:12-214:3.

withheld," and it creates a dispute resolution procedure for distributors to challenge Oxford's decisions in court. Ex. A1, Sample Distributor Agreement, §§ 15.1, 18.

Plaintiffs also claim that Oxford has an "absolute right of first refusal" through the Distributor Agreement to repurchase a territory rather than allowing it to be sold or transferred to a third party. Again, the right of first refusal is not unfettered—the Distributor Agreement limits the duration of the right, the exercise price, and the associated transaction fees. Notably, these terms are not the same in all Oxford Distributor Agreements. For example, some Distributor Agreements give Oxford 30 days to exercise the right of first refusal, whereas others allow only 10 days.[81] Current versions of the Distributor Agreement in use at Oxford do not include a right of first refusal at all.[82] In any event, Oxford's right of first refusal does not operate as a constraint on any distributor's operation of his business or otherwise prevent a distributor from selling his distribution rights.

**10.  Distributors are Not Subject to Uniform Control with Respect to Their Appearance.**

Distributors gave conflicting testimony about whether they are required to wear particular clothing and, if so, what they are required to wear. For example, Plaintiff Monteith testified that he was required to wear a Nature's Own shirt, whereas Plaintiff Boulange explained that he was given a few Nature's Own shirts but was not required to wear them.[83] Plaintiff DeCarlo said he was required to wear a hat, but Plaintiff Daley said wearing a hat was optional.[84] Plaintiff Valdez stated that he was required to wear a uniform, whereas Plaintiff Checca received pants and a shirt

---

[81] *See* Chart of Contract Differences, comparing Distributor Agreements of Tumblin (Doc. 67-16, ¶¶ 14.1, 14.3) and Terry Carr (Doc. 67-8, ¶¶ 15.1, 15.2, 15.4).
[82] Ex. A44, Distributor Agreement for SCM Medrano Distribution Corp. ¶ 15.1.
[83] Ex. A19, Monteith Dep. at 130:22-132:1; Ex. A12, Boulange Dep. at 280:12-280:25.
[84] Ex. A6, DeCarlo Dep. at 149:7-150:5; Ex. A14, Daley Dep. at 112:12-113:13.

from Oxford but only wore them when he wanted to.[85]   Plaintiff DeCarlo testified that he was

required to be clean-shaven, whereas Plaintiff Daley indicated there was no grooming code.[86]

Plainly, no common evidence exists among the distributors on any of the preceding indicia

of alleged control by the Defendants.

## C.    Distributors Manage their Businesses and Take Advantage of their Entrepreneurial Opportunities In Very Different Ways.

In addition to the disparate evidence of control outlined above, Plaintiffs cannot present

common evidence to demonstrate how they manage their businesses and take advantage of the

entrepreneurial opportunities available to them.   Some distributors make no effort to expand their

sales by adding new accounts.[87]   Plaintiff Valdez, for example, testified that although Oxford

encouraged him to find new accounts, he chose not to do so because he did not feel that it was part

of his job.[88]   Other distributors admitted they are able to develop new accounts and described how

they do so through their own initiative.[89]   Similarly, some distributors seek to increase their sales

by persuading store managers to give them extra displays and end caps, while others choose not to

do so.[90]

Distributors also offered inconsistent deposition testimony about their opportunity to

---

[85] Ex. A15, Valdez Dep. at 166:20-167:13; Ex. A18, Checca Dep. at 232:18-233:15.

[86] Ex. A6, DeCarlo Dep. at 212:3-212:17; Ex. A14, Daley Dep. at 112:12-113:13.

[87] *See, e.g.,* Ex. A19, Monteith Dep. at 99:22-99:24 (he never tried to solicit new accounts for his territory).

[88] Ex. A15, Valdez Dep. at 22:24-24:21.  *See also* Ex. A20, Barra Dep. at 74:23-76:5 (he did not attempt to add new cash accounts to his territory because he did not think it was part of his job).

[89] Ex. A14, Daley Dep. at 39:6-40:24.  *See* Ex. A16, Walls Dep. at 49:10-50:15 (he obtained cash account by cross-selling his coffee business); Ex. A8, Green Dep. at 62:1-64:12 (he added two new accounts to his territory by approaching them on his own initiative); Ex. A18, Checca Dep. at 133:7-138:1 (he brought in some small accounts).

[90] *Compare* Ex. A21, Brown Dep. at 202:19-24 (he has asked a store manager to put up special displays without Flowers telling him to do it); Ex. A18, Checca Dep. at 46:5-17 (he has asked store managers for displays to try to increase sales); Ex. A2, Castleberry Dep. at 113:7-114:11 (he sought end caps for product exposure and increased sales, but his ability to get them "varied from store to store"), *with* Ex. A20, Barra Dep. at 57:4-63:2 (he never asked for displays because he doesn't believe they increase sales); Ex. A19, Monteith Dep. at 135:20-135:25 (he never requested end caps).

control business expenses and how, if at all, they attempt to do so.  For example, some distributors lease the trucks that Oxford makes available to them,[91] while others use trucks they own or lease themselves.[92]  Some Plaintiffs invest in expanding their distribution area by purchasing additional territories or accounts; others do not.[93]  Some hire helpers; others do not.[94]  Some purchase home office equipment; others do not.[95]  All distributors pay for their own fuel and maintenance costs, but they make different choices about where to obtain those goods and services.[96]  Some distributors use professional accountants, and others do not.[97]  Some deduct business expenses on their tax returns,[98] but at least one distributor admitted that he does not file tax returns at all.[99]

As a consequence of the fact that distributors make very different choices about how to operate their businesses, they also differ with respect to their overall earnings and profitability. Plaintiff Daley described generating profits in the range of $700 to $900 per week, whereas Plaintiff Green lamented that "on numerous occasions, I had no income. I could work a whole week, and I had no income."[100]  Although some Plaintiffs were tremendously successful in

---

[91] Ex. A18, Checca Dep. at 176:3-177:6 (he understood that he had the option to obtain his own vehicle, but the easiest thing was to take over the lease of the truck he already was using).

[92] Ex. A25, Tumblin Dep. at 194:4-200:15, 204:1-13 (He owns a bread truck but does not use it because he does not want to pay to get it repaired; instead, he uses a Toyota Tundra that he selected himself.  Neither vehicle was financed through Flowers.); Ex. A10, M. Carr Dep. at 232:16-233:3 (he made a business decision to discontinue his lease of the bread truck in order to use his own personal pick-up truck and trailer); Ex. C, Pellettiere Decl. ¶ 44 (he serviced his territory with a truck he rented from Budget).

[93] Ex. H, LaClair 11/29/18 Decl. at ¶ 6.

[94] *See* § II.B.2, *supra*.

[95] Ex. C, Pellettiere Decl. ¶ 51 (describing expenses).

[96] *See* Ex. F, Stewart Decl. ¶ 48; Ex. G, Torgerson Decl. ¶ 45.  *See also* Ex. A17, T. Carr Dep. at 198:16-200:18 (he was responsible for the maintenance on his vehicle); Ex. A21, Brown Dep. at 245:9-246:11 (same); Ex. A4, Dyson Dep. at 78:15-22 (same).

[97] Ex. A15, Valdez Dep. at 112:25-115:2 (he ultimately chose to use a professional accountant other than the one recommended by Oxford); Ex. A8, Green Dep. at 133:18-133:23 (his wife is an accountant and maintained the books for his business).

[98] Ex. A15, Valdez Dep. at 115:19-116:12 (he has filed taxes each year since 2013, taking deductions related to his work as a distributor, including his uniform, gas, vehicle maintenance, and payment of his helper).  *See also* Ex. C, Pellettiere Decl. ¶ 51; Ex. I, Ferranti Decl. ¶ 47.

[99] Ex. A8, Green Dep. at 133:18-134:6, 140:5-8 (admitting he did not file federal or state tax returns when he was an Oxford distributor).

[100] *Compare* Ex. A14, Daley Dep. at 53:13-54:3), with Ex. A8, Green Dep. at 135:8-135:11.

growing the equity value of their businesses, others sold their territories without any gain in equity value.[101]   Given these disparities, which Plaintiffs essentially ignore, there is simply no way to generate an accurate profile of a "typical" Oxford distributor based on representative evidence applicable to any class as a whole.

## III.   ARGUMENT

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart v. Dukes,* 564 U.S. 338, 348 (2011).  To win class certification under Rule 23, Plaintiffs must be able to show that their proposed class meets all four requirements of Rule 23(a) and at least one requirement of Rule 23(b).  Class certification is proper only if the Court "is satisfied, after a *rigorous analysis*, that the prerequisites of Rule 23(a) [and (b)] have been satisfied.  *Id* at 350-51 (emphasis added).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. . . . '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  *Id.*  (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

Material dissimilarities among the members of Plaintiffs' proposed state law classes render Rule 23 certification inappropriate in this case.  As discussed below, Plaintiffs cannot establish common questions of law or fact with respect to any of their putative class claims as required by Rule 23(a)(2).  A question is common to the class if it is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  "[D]issimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Id.*

---

[101] *Compare* Ex. A26, Bolognese Dep. at 62:3-62:6, 99:17-100:13 (after purchasing a territory in 2016, he "doubled" its profitability by adding new accounts), *with* Ex. A12, Boulange Dep. at 63:14-64:19 (no gain).

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury, which requires establishing more than the mere fact that the class members all have suffered a violation of the same provision of law." *Id.* at 349-50. Consequently, the mere allegation that all putative class members have been misclassified as independent contractors is not sufficient to demonstrate commonality.

Likewise, Plaintiffs cannot meet the requirements of Rule 23(b)(2) and (3), as they claim. Certification is improper under Rule 23(b)(2) because Plaintiffs cannot establish that their requested injunctive or declaratory relief is "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Certification under Rule 23(b)(3) is improper because Plaintiffs cannot show that common questions of law or fact predominate over individual issues, such that a class action is superior to other available methods of resolving their claims. Nor can Plaintiffs meet their burden of identifying a reliable, administratively feasible means of ascertaining class membership as implicitly required by Rule 23(b)(3). For all these reasons, Plaintiffs' motion for class certification must be denied.

A. **Class Certification Under Rule 23(b)(2) of the Pennsylvania, Maryland and New Jersey Subclasses is Inappropriate Because Injunctive Relief Cannot Apply Generally to All Such Subclasses.**

Plaintiffs' request for injunctive relief under Rule 23(b)(2) is improper. That rule requires Plaintiffs to demonstrate that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief *is appropriate respecting the class as a whole.*" Fed. R. Civ. P. 23(b)(2) (emphasis added). Plaintiffs seek declaratory and injunctive relief "on behalf of themselves and all putative class members" ordering that they are employees and enjoining Defendants from treating them as independent

24

contractors.  Am. Compl. (Doc. 52), p. 28 ("Prayer for Relief") and Counts II-IV.  Plaintiffs argue injunctive relief is "indivisible" simply because, they argue, "this case requires this Court to declare whether all Distributors are employees or independent contractors."  (Doc. 262-1, p. 71).

Conveniently omitted from Plaintiffs' argument, however, is the fact that Plaintiffs are seeking three separate subclasses of distributors in three different states (PA, MD and NJ) and are asserting different claims for these different subclasses.  Complicating the issue even more is that these different states use different tests for determining independent contractor status.  As the discussion above establishes, a carte-blanche determination that all distributors are employees or independent contractors cannot be made on this record for one subclass alone given the significant differences by and between distributors on facts material to their misclassification claims.[102] Adding different legal claims and different legal tests on top of this already individualized and varied analysis complicates the issue even more.  Against this backdrop, it is abundantly clear that determination of independent contractor status for all three subclasses together is *not* susceptible to common proof but rather requires multiple layers of individualized inquiries, all of which can and do vary based on each distributor's different circumstances.  Given this evidentiary record and the different legal claims, Plaintiffs simply cannot establish "that final injunctive relief or corresponding declaratory relief *is appropriate respecting the class as a whole"* as required to sustain their bid for Rule 23(b)(2) certification, and this request must be denied accordingly.

---

[102] Indeed, if the Court did make a carte-blanche determination based on this record, significant due process concerns are implicated for putative class members.  Rule 23(b)(2) classes do not provide for the opportunity for notice or to opt out.  Due process is not satisfied here if distributors who own multiple territories with significant equity, for example, are forced to become employees and face the consequences of this determination on their equity ownership interests.  *See* Ex.G, Torgerson Decl ¶ 61 ("I would rather be an employee than an independent contractor because of all the expenses of being an independent business person."); Ex. F, Stewart Decl. ¶ 50 ("I would rather be an independent distributor than an employee because I have the freedom to be my own boss.").

Finally, Plaintiffs do not and cannot articulate how injunctive relief could *actually be implemented* in a manner that is "appropriate respecting the class as a whole," as required by Rule 23(b)(2).  Plaintiffs fail to explain how their requested injunctive relief will impact class members who are themselves employers or did not personally service their territories for significant periods of time.  Plaintiffs fail to explain how injunctive relief could actually force these individuals to operate as employee of Defendants.  Moreover, some distributors no longer own their distributorships—including all the Named Plaintiff representatives for the putative New Jersey and Pennsylvania classes—yet Plaintiffs fail to explain how injunctive relief would apply to both current and former distributors alike who have markedly different situations.[103]  In short: the record here makes clear that injunctive relief simply cannot be rendered on a one-size-fits-all basis with regard to one subclass alone, let alone all three combined.  Rule 23(b)(2) certification is improper as a result.

**B.**    **Plaintiffs Cannot Demonstrate that the Pennsylvania, Maryland, and New Jersey Rule 23 Classes are Ascertainable under Rule 23(b)(3).**

Class ascertainability is an "essential prerequisite of a class action" brought under Rule 23(b)(3).  *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).  "[A] plaintiff must show, by a preponderance of the evidence, that the class is 'currently and readily ascertainable based on objective criteria,'"

---

[103] Five Named Plaintiffs in these consolidated actions performed work as Oxford independent distributors in Pennsylvania, Maryland, or New Jersey.  Of these, Maryland distributor Greg Brown is the only one who remains in business and has standing to injunctive or declaratory relief.  The remaining Named Plaintiffs cannot be adequate representatives of any state law class seeking prospective equitable relief.  *See Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189-92 (11th Cir. 2003) (finding class representatives inadequate where their economic interests and objectives conflicted with unnamed class members); *see also Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) (finding current franchisees who had an interest in the continued viability of the franchisor had an inherent conflict with former franchisees whose only interest was in the maximization of damages).

*Abraham v. Ocwen Loan Servicing, LLC*, 321 F.R.D. 125, 177 (E.D. Pa. 2017) (quoting *Marcus*, 687 F.3d at 593), and the court "must undertake a rigorous analysis of the evidence to determine if the standard is met." *Abraham*, 321 F.R.D. at 177 (quoting *Carrera*, 687 F.3d at 306). If class membership cannot be ascertained from a defendant's records alone, Plaintiffs must propound a "reliable, administratively feasible alternative" that goes beyond simply relying on the "say so" of potential class members. *Carrera*, 727 F.3d at 304 (quoting *Marcus*, 687 F.3d at 594). Class certification is inappropriate if the identification of class members will require "extensive and individualized fact-finding or 'mini-trials.'" *Carrera*, 727 F.3d at 303-304 (quoting *Marcus*, 687 F.3d at 593). Moreover, "a plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful." *Carrera*, 727 F.3d at 306. "A party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient." *Id.* (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008).

Plaintiffs define their proposed state law classes to include "persons who are or performed work as" Oxford independent distributor in either Pennsylvania, Maryland, or New Jersey. Am. Compl. (Doc. 52) ¶¶ 57, 58, and 59. This assumes a distributor properly falls within one of the putative Rule 23 classes in this case merely by virtue of being present or performing any amount of work in Pennsylvania, Maryland or New Jersey. To the contrary, several layers of factual analysis will be necessary to decide whether certain distributors belong to a class and, if so, which one. The Court first must evaluate whether each distributor has sufficient contacts with Pennsylvania, Maryland, or New Jersey to assert a claim under that state's wage and hour laws, and each state has a different fact-based test for making that determination. For example, a worker can bring a claim under the Maryland Wage Payment and Collection Law so long as he has been

instructed or allowed to perform work "to some extent" within the state.  *See Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 456 (D. Md. Sept. 17, 2015) (citing Md. Code, Lab. & Empl. §§ 3-101(c)(2), 3-501(b)).  Merely performing "some work" in New Jersey, by contrast, will not support a claim under the New Jersey Wage Payment Law.  *See Overton v. Sanofi-Aventis U.S., LLC,* 2014 WL 5410653, at *6 (D.N.J. Oct. 23, 2014) (plaintiff could not assert claim under the NJWPL despite working occasionally in employer's New Jersey office, being supervised from New Jersey, having business cards identifying them as New Jersey employees).  A worker generally must be "based in Pennsylvania" in order to bring a claim under the Pennsylvania Wage Payment Collection Law, and this test turns on such fact-specific considerations as the location of the alleged employer's headquarters, the worker's physical presence working in Pennsylvania, the extent of the worker's contact with the alleged Pennsylvania employer (in terms of reporting, direction, supervision, hiring, assignment, and termination), the worker's place of residence, and the worker's ability to bring a claim under the laws of another state.  *See McGoldrick v. TruePosition, Inc.*, 623 F. Supp. 2d 619, 631 (E.D. Pa. 2009) (surveying case law).  Plainly, some assessment of the facts and circumstances of each potential class member's claim will be necessary to determine whether he can assert a claim under Pennsylvania, New Jersey, or Maryland wage laws.

Next, the Court must perform an individualized choice of law analysis for each distributor who performed work in both a Rule 23 state and *any other state* during the limitations period.  "A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply."  *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833-MSG, 2015 WL 3623005, at *25 (E.D. Pa. Jun. 10, 2015) (quoting *Powers v. Lycoming Engines*, 328 F. App'x 121, 124 (3d Cir. 2009)).  "A court 'must apply an individualized choice of law analysis to each plaintiff's

claims' raised by a proposed class action." *Vista Healthplan, Inc.*, 2015 WL 3623005, at *25 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823 (1985))).   Applying Pennsylvania's choice of law rules,[104] the Court first must determine "whether there is an actual or true conflict between the potentially applicable laws."   *Vista Healthplan, Inc.*, 2015 WL 3623005, at *26 (citing *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229-30 (3d Cir. 2007)).   If there are differences between the laws in question, the Court must examine the governmental policies underlying each state's law in order to determine whether a "true conflict" exists and, if so, which state has "the greater interest in the application of its law."   *Vista Healthplan, Inc.*, 2015 WL 3623005, at *26 (citing *Hammersmith*, 480 F.3d at 230).

During the time period relevant to Plaintiffs' state law claims, thirty-nine independent distributors owned the distribution rights in one or more Oxford territories that overlap a border of Pennsylvania, Maryland, or New Jersey.[105]   These territories present nine potential choice of law combinations: Pennsylvania and Maryland, Pennsylvania and New Jersey, Pennsylvania and Delaware, Maryland and West Virginia, Maryland and the District of Columbia, Maryland and Virginia, Maryland and Delaware, New Jersey and New York, and New Jersey and Delaware.[106] Given the factual analysis necessary to determine whether a distributor is covered by the wage laws of even a single state, there is no "reliable, administratively feasible" means to assign these thirty-nine cross-over distributors to one of the proposed Rule 23 classes without undertaking an "extensive individualized fact-finding" and legal analysis.

---

[104] A federal court sitting in diversity jurisdiction must apply the choice of law rules of the forum state.   *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).
[105] Ex. H, LaClair 11/29/18 Decl. ¶ 2.
[106] *Id*.

To complicate the choice of law analysis yet further, each putative class member's Distributor Agreement contains a choice of law clause, and not all of them are the same.[107]  The Named Plaintiffs themselves signed Distributor Agreements with three different choice of law provisions—Virginia (Greg Brown), Pennsylvania (Terry Carr), and New York (James Checca).[108] Plaintiff Luke Boulange, the sole representative of the *New Jersey* Rule 23 class, has a *Pennsylvania* choice of law clause in his Distributor Agreement.[109]  If Plaintiffs seek to challenge the enforceability of these choice of law provisions, the analysis will require yet another layer of individualized factual analysis.   In Pennsylvania, "courts generally honor the intent of the contracting parties and enforce choice of law provisions executed by them."  *Youtie v. Macy's Retail Holding, Inc.*, 626 F. Supp. 2d 511, 518 n.4 (E.D. Pa. 2009) (quoting *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir 1994)).  "The choice of law provision stands 'unless: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [Restatement (Second) of Conflicts of Law] § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'"  *Youtie*, 626 F. Supp. 2d at 518 n.4 (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 463-64 (3d Cir. 2006)).

---

[107] The choice of law provision in the sample Distributor Agreement states, "This Agreement and the construction thereof shall be governed by the laws of the State of Pennsylvania, without regard to the conflict-of-law rules, and any dispute arising under this Agreement or relating to the relationship created by this Agreement shall be subject to the exclusive jurisdiction of the federal or state courts of Pennsylvania." Ex. A1, Sample Distributor Agreement ¶ 21.15. The language of this provision is substantially the same in each Distributor Agreement—save for the fact that the Agreements designate different substantive state laws.

[108] Ex. A35 (Checca Distributor Agreement).

[109] Ex. A36 (Boulange Agreement).

Contrary to Plaintiffs' representations, Defendants do not possess the records necessary to ascertain exactly which independent distributors belong in each proposed state law class under these legal tests.[110]   Defendants do not collect or maintain records regarding the hours of work performed by independent distributors, and consequently they have no means to determine exactly how much time a distributor spends working in any given state.[111]   For example, Plaintiff Castleberry, whose territory includes accounts in both Pennsylvania and New Jersey, admitted that he does not record the hours he spends working in each state, and the data in his handheld does not reflect time spent traveling to customer locations in his personal vehicle to rotate product.[112] Plaintiff Boulange, who lives in Pennsylvania and spends five days a week driving between a warehouse in Pennsylvania and customer accounts in New Jersey, also does not record his hours of work.[113]   Plaintiff Walls lives in New Jersey, works from a warehouse in Delaware, delivers to customers in New Jersey, and has a Kentucky choice of law clause in this Distributor Agreement.[114]   Moreover, even if a given distributor's handheld computer records could reveal some information about account activity, they still would not show whether the distributor was performing work *personally* rather than through his own employees or helpers.[115]   Even if there were a "reliable, administratively feasible" means to obtain this evidence—something beyond merely accepting Plaintiffs' "say so"—the assessment of this evidence still would require exactly the sort of "individualized fact-finding and mini-trials" that render class certification inappropriate

---

[110] Plaintiffs claim that "Defendants are still producing data regarding the number of class members in each state." Doc. 262-1, p. 22 n.2.  Defendants are unaware of any such outstanding discovery request.
[111] Ex. H, LaClair 11/29/18 Decl. ¶ 3.
[112] Ex. A2, Castleberry Dep. at 60:13-62:7.
[113] Ex. A12, Boulange Dep. at 68:16-69:21, 187:16-24, 191:22-25, 246:21-247:10.
[114] Ex. A16, Walls Dep. at 10:7-9, 33:16-34:1, and Dep. Ex. 2.
[115] Ex. H, LaClair 11/29/18 Decl. ¶¶ 4-5.

in the Third Circuit.   Accordingly, Plaintiffs cannot meet their burden of demonstrating by a

preponderance of the evidence that each proposed Rule 23 class is ascertainable.

**C.**      **The Court Should Not Certify a Rule 23 Class with Respect to The Pennsylvania Claims Because Plaintiffs Have Failed to Establish Common Questions of Law or Fact and Because Individual Issues Predominate.**

The Pennsylvania class should not be certified because individual issues predominate over

any common issues.   The predominance standard is "far more demanding than the commonality

requirement."   *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310-11.   Because common

issues must predominate over individual claims, "[i]f proof of the essential elements of the cause

of action requires individual treatment, then class certification is unsuitable."   *Id.* at 311 (quoting

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir.2001)).   To

satisfy the predominance requirement, Plaintiffs must therefore demonstrate that the elements of

their causes of action are "capable of proof at trial through evidence that is common to the class

rather than individual to its members."   *Id.* at 311-12.   Deciding this issue requires this Court to

envision the form that a representative trial of the Plaintiffs' claims will take and conduct a

"rigorous assessment of the available evidence and the method or methods by which [P]laintiffs

propose to use the evidence" to prove their claims.   *Id.* at 312.   Here, that assessment will be riddled

with individualized inquiries and as such, Plaintiffs have failed to establish questions of law or fact

common to the putative class.

1. **The Pennsylvania Minimum Wage Act ("PMWA") Claim for Overtime Should Not be Certified as a Class Action.**

   a. **The PMWA overtime claim cannot be resolved on a class-wide basis because the threshold classification issue requires application of the economic realities test.**

Plaintiffs' PMWA claim for overtime cannot be resolved on a class-wide basis because the threshold classification issue requires application of the fact-specific economic realities test. To determine whether an individual is an "employee" under the PMWA, courts utilize a fact-intensive, multi-factor "economic realities" test that examines the totality of the circumstances underlying the parties' relationship and looks at the "degree of control exercised by [the alleged employer] over the workers." *Sofranko v. Northwestern Mut. Life Ins.*, 2008 WL 145509, at *3 (W.D. Pa. Jan. 14, 2008).[116] No one factor is determinative. *Stuber*, 822 A.2d at 874; *Sofranko*, 2008 WL 145509, at *3 ("determination of the employment relationship does not depend on isolated factors but rather on the circumstances of the whole activity"). As such, the existence of alleged evidence of a company's *right* to control is not dispositive under the PMWA and a more probing inquiry is required. Resolving the economic realities test on a class-wide basis is impossible due to the inherently individualized assessment necessary to analyze the totality of the circumstances surrounding the relationship between Oxford and distributor. *See, e.g.*, *Sherman v. Am. Eagle Exp., Inc.*, No. 09-cv-575, 2012 WL 748400, at *12 (E.D. Pa. Mar. 8, 2012). ("[I]n deciding whether [defendant's delivery drivers] were employees under the [P]MWA, this Court would have to make an individualized examination into each class member's relationship with [defendant].").

---

[116] Under the economic realities test, the relevant considerations are: (1) the degree of control exercised by the employer over the workers; (2) the worker's opportunity for profit or loss depending upon managerial skill; (3) the alleged worker's investment in equipment or material required for the tasks or the employment of helpers; (4) whether the service rendered requires special skill; (5) the degree of permanence of the working relationship; and (6) the extent to which the work is an integral part of the employer's business. *Commonwealth, Dep't of Labor & Indus. v. Stuber*, 822 A.2d 870, 874 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004).

Accordingly, no proof can resolve "the validity of each one of [Plaintiffs'] claims in one stroke." *See Dukes*, 548 U.S. at 350 (the inquiry "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

In *Sherman*, delivery drivers sought certification of putative Rule 23 class predicated upon alleged violations of Pennsylvania wage and hour law. *Sherman*, 2012 WL 748400, at *12. As in this case, the critical issue was whether these individuals were properly classified as independent contractors. The Plaintiffs in *Sherman* argued that their claims could be resolved by common evidence because the company's general policies demonstrated its *right to control* the manner in which the drivers performed. *Id*. at 11. The Court, however, rejected this as "neither helpful nor appropriate." *Id*. Rather, the Court explained that "in deciding whether [defendant]'s delivery drivers were employees under the [P]MWA, this Court would have to make an individualized examination into each class member's relationship with [defendant]." and that "[t]he need for this kind of individualized inquiry renders the [P]MWA claims unsuitable for class-wide treatment." *Id.* at *12.

So too here. The fact-intensive analysis of the totality of the circumstances of each distributor's relationship with Oxford necessary to assess their PMWA claims precludes class-wide treatment. Even a cursory review of the testimony of Pennsylvania distributors demonstrates that their experiences vary widely with respect to the relevant factors. Some members of the putative Pennsylvania class own distribution rights in multiple territories and service one or more of them with their own employees. For example, Luis Burgos owns four territories and Edward

Blaes  owns two territories.[117]  Pennsylvania class members also differ significantly with respect to the duration of their working relationship with Oxford.  For example, Daniel Miller was an independent distributor for less than six months (from 1/14/13 until 6/10/13), whereas Kurt Balascik has been an active independent distributor for almost 7 years (since 2/20/12).[118]

There is also distinct variation in the way Pennsylvania putative class members choose to operate their businesses and the degree of control *actually exercised* by Oxford. For example, Plaintiff Green had three employees, each of whom he paid differently,[119] while Plaintiff Monteith chose not to hire anyone to help him with his distributorship.[120] Plaintiff Monteith testified that he needed approval to change the suggested orders and only did so once or twice a year.[121]  In contrast, Plaintiff Pellettiere testified that he made changes to his suggested order "almost every day."[122] Similarly, while Plaintiff Monteith testified to having always been subject to a 15 percent stale cap,[123] Plaintiff Dyson testified that the stale cap changed over time.[124]  Distributors' experience differs with respect to dress and grooming requirements[125] and general oversight from Oxford.[126]

---

[117] Ex. H, LaClair 11/29/18 Decl. ¶ 6.
[118] *Id.* ¶ 7.
[119] Ex. A8, Green Dep. at 205:6-207:6.
[120] Ex. A19, Monteith Dep. at 58:11-58:16.
[121] *Id*. at 91:10-21.
[122] Ex. A3, Pellettiere Dep. at 177:6-8.
[123] Ex. A19, Monteith Dep. at 88:2-7.
[124] Ex. A4, Dyson Dep. at 67:21-24.
[125] *See e.g.*, Ex. A14, Daley Dep. at 112:12-113:13 (distributors were not subject to a grooming code); Ex. A6, DeCarlo Dep. at 212:3-212:17 (Oxford had a grooming procedure that required him to be clean-shaven); Ex. A31, Beese Dep. at 183:1-183:2 (he was not required to wear a uniform); Ex. A7, Jankowski Dep. at 128:2-128:18 (he was told to wear a t-shirt because people were complaining that he was not wearing a uniform).
[126] *See e.g.*, Ex. A19, Monteith Dep. at 68:7-69:5 (sales managers monitored the way he loaded his truck and instructed him to load it "their way" instead of the way he wanted to do it); Ex. A17, T. Carr Dep. at 215:20-216:1 (he did not have an order in loading trucks; he loaded it "randomly").

Because the application of the economic realities test depends on assessing the individualized circumstances relating to each distributor's relationship with Oxford, Plaintiffs PMWA claims are not appropriate for class-wide treatment.[127]

        **b.**      **The PMWA claim cannot be resolved on a class-wide basis because Plaintiffs' hours of overtime work, if any, and Defendants' knowledge of the same are individualized inquires and not subject to representative proof.**

Certification of Plaintiff's PMWA overtime claim should also be denied because the claim cannot be proven on a classwide basis. To determine whether a class member has incurred "overtime" within the meaning of the PMWA and the amount of any overtime, it must be determined how many hours that person *actually* worked. *See* 34 Pa. Code § 231.43(7)(b) (For purposes of calculating overtime hours, an employee's "regular rate is determined by totaling all the sums received at the day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for hours worked in excess of 40 in the workweek."). Thus, the determination of whether overtime is owed must proceed on a case-by-case assessment and certification is not proper. *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002) ("If proof of the essential elements of the cause of action requires individual treatment, the class certification is unsuitable."); *Swank v. Wal-Mart Stores, Inc.*, 2018 WL 2684102, at *6-7 (W.D. Pa. June 5, 2018) (denying class certification because while "the [putative plaintiffs'] jobs were similar in some ways, [they] had a wide array of individualized experiences that varied significantly in ways that bear materially on the analysis of their primary duties" and "[w]ithout a common narrative in the record as to what the [putative plaintiffs] actually

---

[127] Even assuming arguendo Plaintiffs could establish employee status on a class-wide basis, the alternative defenses set forth below further demonstrate that class treatment is inappropriate.

did on a day-to-day basis, this Court cannot extrapolate the primary duty of all [putative plaintiffs] in Pennsylvania on a class-wide basis"); *Verma v. 3001 Castor, Inc.*, No. 13-cv-3034, 2014 WL 2957453, at *15 (E.D. Pa. June 30, 2014) (denying class certification of Pennsylvania state law claims based on failure to meet predominance requirement as claims required an individualized determination of the hours worked by each dancer and whether the cash received from customers could count toward the minimum wage); *Evans v. Lowe's Home Centers, Inc.*, 2006 WL 1371073, at *9 (M.D. Pa. May 18, 2006) (finding predominance requirement not met under PMWA where a showing of "individualized proof" was required).

District Courts in the Third Circuit, including this one, have not hesitated to deny class certification of PMWA claims where individualized evidence would be necessary to determine how much uncompensated overtime any class member might be entitled to receive and which defenses may be appropriate.  For example, in *Diabate v. MV Transportation, Inc.*, No. 14-cv-857-WB, 2015 WL 4496616, at *13 (E.D. Pa. July 20, 2015), this Court concluded that class certification was inappropriate because an individualized factual inquiry was necessary to determine whether class members actually performed any unpaid pre-shift work, if so how much, and that class treatment would have precluded the defendant from exploring whether individual claimants were engaged in non-compensable activities during pre-shift time, and thus would have handicapped defendant's ability to defend against the claims.  *See also Masterson v. Fed. Exp. Corp.*, 269 F.R.D. 439, 444 (M.D. Pa. 2010) (denying motion to certify PWPCL class where the court "would have to undertake individualized factual inquiries regarding whether a particular employee was required to perform unpaid work, whether he or she actually did perform unpaid work, and *how much* work was performed to resolve class members claims." (emphasis added)).  Here, the evidence reflects that there was no common schedule or practice with respect to hours

distributors worked.[128]  Because Plaintiff's overtime claims must be resolved on an individualized basis, Plaintiffs cannot establish commonality or predominance.

> c. **The PMWA claim cannot be resolved on a class-wide basis because the Motor Carrier Act exemption requires individualized proof.**

The Pennsylvania overtime statute contains an explicit provision excluding from overtime "[a]ny employe of a motor carrier with respect to whom the Federal Secretary of Transportation has power to establish qualifications and maximum hours of service under 49 U.S.C. § 3102(b)(1) and (2) (relating to requirements for qualifications, hours of service, safety and equipment standards)." 43 Pa. Stat. Ann. § 333.105.  This exemption "applies equally to the FLSA and PMWA." *Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786, 790 n.5 (3d Cir. 2016); *see also Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 876 n.4 (3d Cir. 2015) (noting that identical principles govern claims under FLSA and PMWA exemptions).  Under the FLSA's motor carrier exemption, overtime pay is not required for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1).  This includes any "operator of a commercial motor vehicle . . . who directly affects commercial motor vehicle safety in the course of employment." 49 U.S.C. §§ 31502(b), 31132(2)(A).  A commercial motor vehicle ("DOT vehicle") is defined to include "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle . . . has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater[.]" *Id.* at § 31132(1).  In 2008, Congress narrowed the scope of the motor

---

[128] *See e.g.*, Ex. A10, M. Carr Dep. at 182:17-21 ("you can start whenever you want … within reason"); Ex. A7, Jankowski Dep. at 74:25-75:8 (he was never given a schedule of hours to work; his hours varied from one day to the next); Ex. A19, Monteith Dep. at 126:5-126:7 (he was able to adjust his arrival time to the warehouse); Ex. A14, Daley Dep. at 75:8-76:10 (Daley arrived at the warehouse around 5:00 a.m. each day because that is when Flowers wanted him to start).

carrier exemption by requiring the payment of overtime to motor carrier employees whose work "in whole or in part" affects the safety of *non*-DOT vehicles in interstate commerce.[129]  The Third Circuit has expressly declined to define the term "in part," leaving open the question whether it includes *de minimis* use.  *McMaster v. Eastern Armored Servs., Inc.*, 780 F.3d 167, 169-70 & n.4 (3d Cir. 2015).  It also left unanswered the question whether an employee is "entitled to overtime only for those workweeks in which she actually performed work on vehicles lighter than 10,000 pounds." *Id*. at 169 n.l.  Consequently, the motor carrier exemption will require analysis of (1) the vehicle(s) that each Plaintiff operated, and which are "commercial motor vehicles" regulated by the DOT; and (2) when and how much, if at all, the Plaintiff operated each vehicle to transport product in interstate commerce.[130]

Though all distributors use some form of truck or trailer to distribute product, they use vehicles that vary in weight above and below 10,001 pounds.  Moreover, the alleged use of personal vehicles (weighing less than 10,001 pounds) by some—but not all—of the distributors will require an individualized inquiry into *each distributor's* personal vehicle use on a week-to-week basis.  The evidence on this point varies widely.  For example, Plaintiff Green testified that he used his personal vehicle to move product between accounts approximately 10-15 times per year in 2013 and early 2014, but stopped this practice altogether in April 2014.[131]  By contrast, Plaintiffs DiMemmo and Monteith testified they usually used their personal vehicles on

---

[129] SAFETEA-LU Technical Corrections Act of 2008 ("TCA"), 49 U.S.C. § 13102, Pub. L. No. 110-244, § 305(c) (requiring payment of overtime to motor carrier employees "whose work, in whole or in part, is defined as . . . affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce").

[130] For purposes of the motor carrier exemption, interstate commerce includes delivery of goods produced out-of-state in response to specific customer orders when such goods remain in the "'practical continuity of movement' between the intrastate segment and overall interstate flow."  *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1229 (11th Cir. 2009).

[131] Ex. A8, Green Dep. at 187:1-192:24.

Wednesdays and Sundays.[132]  There is simply no common, representative evidence with which to

establish a defense under the MCA exemption.  For these reasons, courts routinely decertify FLSA

collective actions involving the MCA exemption.  *See, e.g., Harrison v. Delguerico's Wrecking &*

*Salvage*, No. 13-5353, 2016 WL 826824, *6-8 (E.D. Pa. Mar. 2, 2016) (granting decertification,

in part, due to individualized MCA defense); *Rojas v. Garda CL Se., Inc.*, 2015 WL 5084135, at

*6 (S.D. Fla. Aug. 28, 2015) (decertifying due to individualized inquiries in the MCA exemption).

The same reasoning should apply here to Rule 23 certification under Pennsylvania law.

> **d.      The PMWA claim cannot be resolved on a class-wide basis because
> the sales exemption requires individualized proof.**

Pennsylvania law also exempts outside salespersons from the definition of "employee"

applicable to overtime payment. 43 Pa. Stat. § 333.105.  "Outside salesman" means an employee

who is employed for the purpose of and who is customarily and regularly engaged more than 80

percent of work time away from the employer's place or places of business in the following

manner:

> (1) Making sales, including any sale, exchange, contract to sell, consignment for sale, or
> other disposition or selling, and delivering articles or goods.
>
> (2) Obtaining orders or contracts for the use of facilities for which a consideration will be
> paid by the client or customer. In addition, the employee may not spend more than 20% of
> the hours worked in any week in work of a nature not directly related to and in conjunction
> with the making of sales; provided however, that work performed incidental and in
> conjunction with the employee's own outside sales or solicitations, including incidental
> deliveries and collections shall not be regarded as nonexempt work.

34 Pa. Code § 231.85.

An outside salesman "is any employee whose primary duty is making any sale, exchange,

contract to sell, consignment for sale, shipment for sale, or other disposition," or "obtaining orders

---

[132] Ex. A29, DiMemmo Dep. at 185:1-13; Ex. A19, Monteith Dep. at 103:13-104:1.

or contracts for services or for the use of facilities for which a consideration will be paid by the

client or customer" and "who is customarily and regularly engaged away from the employer's

place or places of business in performing such primary duty." *Christopher v. SmithKline Beecham

Corp.*, 567 U.S. 142, 148 (2012) (*quoting* 29 U.S.C. § 203(k), 29 C.F.R. § 541.500(a)(1), (2)).

Individual inquiries will necessarily predominate on whether distributors' spent more than 20% of

the hours worked in any week in work of a nature not directly related to and in conjunction with

the making of sales.  The individualized nature of the inquiry precludes certification.  *See, e.g., In

re Prospect Mortg., LLC, Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 987 F. Supp.

2d 1383, 1383 (J.P.M.L. 2013) ("Individualized factual disputes, however, will predominate in

this litigation, which is likely to focus on the applicability of certain exemptions to individual

plaintiffs, such as the 'outside sales' exemption"); *Gordon v. Maxim Healthcare Servs.*, Inc., No.

13-cv-7175, 2017 WL 3116153, at *15 (E.D. Pa. July 21, 2017) (denying class certification under

the WPCL finding the individualized nature of the FLSA exemption inquiry to determine whether

the nature of the work performed satisfied the exemption precluded certification). Here, it would

be necessary to individually assess how each distributor operates his or her distributorship in order

to determine whether the outside salesperson exemption would apply. Because of the differences

in distributors' efforts distributors to make sales and the extent to which they took advantage of

entrepreneurial opportunities,[133] this defense will require individualized inquiries and precludes

certification.

---

[133] *See e.g.,* Ex. A10, M. Carr Dep. at 252:2-17 (Carr uses displays which can maximize sales); Ex. A8, Green Dep. at 37:3-50:20 (Green was able to fill vacant space at a particular Walmart by speaking with the managers); Ex. A19, Monteith Dep. at 135:20-135:25 (he never requested any end caps for his accounts); Ex. A14, Daley Dep. at 72:3-74:4 (Daley never requested additional shelf space).

2. **The Pennsylvania Wage Payment Collection Law ("PWPCL") Claim for Deductions Should Not be Certified as a Class Action.**

   a. **The PWPCL claim cannot be resolved on a class-wide basis because Flowers Distributor Agreement sets forth only a general framework thus requiring individualized evidence of course of dealings with distributors.**

Plaintiffs' PWPCL deductions claim cannot be resolved on a class-wide basis because the Distributor Agreement sets forth only a general framework thus requiring individualized evidence of course of dealings with distributors. The relationship between franchisors and franchisees is illustrative in this situation. *See, e.g.*, *Myers v. Jani-King of Phila., Inc.*, No. 09-cv-1738, 2015 WL 1055700, at *13 (E.D. Pa. Mar. 11, 2015) ("[T]he analysis revolved around whether a franchise relationship was also an employment relationship because the franchisor controlled not only 'the result of the work but ha[d] the right to direct the manner in which the work [was] accomplished.' Because both analyses are centered on the same issue—determining whether the franchisor sufficiently controls the manner in which the franchisee performs—we conclude that the cases addressing the vicarious liability of franchisors are illustrative of what Plaintiffs must prove to establish that a franchisee is an employee under the [P]WPCL.").

"Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties." *Drexel v. Union Prescription Ctrs., Inc.*, 582 F.2d 781, 786 (3d Cir. 1978). The Distributor Agreement states unequivocally: "DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTORS business, it being understood that the primary interest of COMPANY is the

42

results achieved by DISTRIBUTOR."[134]  The Agreement characterizes this understanding as an "[e]ssential [t]erm" of the contract. This emphatic language makes it clear that the Agreement "does not grant [Flowers] a right of control."

The focus of the inquiry should be "whether the alleged master has day-to-day control over the manner of the alleged servant's performance." *Myszkowski v. Penn Stroud Hotel, Inc.,* 634 A.2d 622, 626 (Pa. Super. Ct. 1993).  It is difficult for a principal to control how a job gets done if the principal cannot even decide who does it. The Agreement here "does not require that DISTRIBUTOR's obligations . . . be conducted personally, or by any specific individual."[135] Rather, the distributor remains "free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR's responsibilities."[136] These provisions show that Flowers's principal concern is that the work gets done, not who does it.  They confirm that Flowers has the right to control the result of the work only and not the means by which such result is accomplished.

Just as important as what the Distributor Agreement does say is what it does not.  The Agreement does not tell distributors the times at which they must begin and end work.  It does not tell them what kind of vehicle to use or what routes to follow, or how fast to drive.  It does not tell them which customers to serve.  It does not tell them what kinds of marketing strategies to deploy when developing new business.  It does not tell them to wear uniforms.  And so on.  In short, the Agreement leaves just about every detail of the work to the distributor's discretion, further corroborating the distributors' status as independent contractors rather than employees.

---

[134] Ex. A1, Sample Distributor Agreement § 16.1.
[135] *Id*. § 16.3.
[136] *Id.*

In addition, because the Distributor Agreement leaves the details of the distributor's work to their discretion, an individualized analysis is required, as the distributors cannot set forth common evidence regarding course of dealing.  For example, Plaintiff Matt Carr testified that "you can start whenever you want"[137] whereas Plaintiff Daley testified that Flowers dictated his start time and penalized or wrote him up for not showing up at a particular time.[138]  Moreover, with respect to managerial oversight, Plaintiff Monteith testified that sales managers monitored the way he loaded his truck and instructed him to load it "their way" instead of the way he wanted to do it[139] compared to Plaintiff Carr who testified that he did not have an order in loading trucks; he loaded it "randomly."[140]  These differences in testimony regarding the details of distributors' work also extend to such things as product sales,[141] displays,[142] and grooming requirements.[143]

All in all, the terms of the Agreement simply do not support a right of control; quite the opposite, they refute it.  To establish their claims, then, Plaintiffs must rely on the distributors' individual experiences to argue that Flowers enjoys a right to control in practice, even though the contract denies it such a right in theory.  *See Dukes*, 564 U.S. at 353 (because employer's "announced policy" forbade discrimination, employees had to rely on individual experiences to prove discrimination claims); *Flores v. Supervalu, Inc.*, 509 F. App'x 593, 594 (9th Cir. 2013), (because employer's written policies allowed meal and rest breaks, employees had to rely on

---

[137] Ex. A10, M. Carr Dep.  at 182:17-21

[138] Ex. A14, Daley Dep. at 17:5-17:23

[139] Ex. A19, Montieth Dep. at 68:7-69:5.

[140] Ex. A17, T. Carr Dep. at 215:20-216:1.

[141] *Cf.* Ex. A10, M. Carr Dep. at 252:2-17(stating that he uses displays which can maximize sales) *with* Ex. A19, Monteith Dep. at 135:20-135:25 (stating that he never requested any end caps for his accounts).

[142] *Cf.* Ex. A7, Jankowski Dep. at 68:23-69:7 (testifying that it was his choice to seek displays) *with* Ex. A14, Daley Dep. at 62:10-63:24 (testifying Flowers controlled when to put up end caps and displays).

[143] *Cf.* Ex. A14, Daley Dep. at 112:12-113:13 (distributors were not subject to a grooming code) *with* Ex. A6, DeCarlo Dep. at 212:3-212:17 (he was required be clean-shaven).

individual experiences to prove meal-and-rest-break claims).  And, as explained below, the need

to engage in such an inquiry makes class certification inappropriate.

> **b.     The PWPCL claim cannot be resolved on a class-wide basis because**
> **determining whether a distributor is engaged in a distinct**
> **occupational business necessarily requires individualized inquiries.**

Pennsylvania courts have looked to a series of factors to determine whether an individual

is an employee or an independent contractor, including:

> [T]he control of the manner that work is to be done; responsibility for result only; terms of
> agreement between the parties; the nature of the work or occupation; the skill required for
> performance; whether one employed is engaged in a distinct occupation or business; which
> party supplies the tools; whether payment is by the time or by the job; whether the work is
> part of the regular business of the employer, and the right to terminate the employment at
> any time.

*Miller v. Cerebain Biotech Corp.*, No. 16-cv-3943, 2016 WL 6600009, at *3 (E.D. Pa. Nov. 8,

2016).  As set forth in the Distributor Agreements, distributors and their companies have the

freedom to engage in outside business including, explicitly, the right to carry any non-competing

products in the performance of their distributorships.  Distributors are also, of course, not required

to personally service any of their territories, and can choose instead to engage in any other

business.[144]  The evidence demonstrates, however, that distributors vary widely in the extent to

which they operate as independently established businesses.  While some distributors use their

companies solely to distribute Flowers products, several other distributors conduct outside

businesses and use their distributorships to sell and distribute other non-Flowers products.[145]

In *Soares*, a misclassification case brought by distributors of another Flowers-affiliated

bakery, the court denied class certification, finding (in pertinent part) that whether a distributor

---

[144] *See* § II.B.2, *supra*.
[145] *Id.*

was engaged in a distinct business or occupation was "riddled with individualized inquiries" and, therefore, predominance was not satisfied. *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 482 (N.D. Ca. 2017). The same reasoning applies here.

> **c.     The PWPCL claim cannot be resolved on a class-wide basis because individual inquiries regarding deduction authorizations predominate.**

Plaintiffs seek compensation on behalf of the purported class for alleged improper deductions under the PWPCL. Even if the putative class could prove employee status by common evidence, which they cannot, the PWPCL provides that deductions from pay are permitted where the employee has authorized the deduction in writing. 34 Pa. Code § 9.1. As Defendants will prove on the merits at summary judgment, all debits from distributors' settlement statements for various business expenses were authorized in writing.

For purposes of class certification, however, even assuming that these debits were somehow not permitted under Pennsylvania law, determination of the available remedies would require highly individualized inquiries. First, while all distributors executed written authorizations for these debits, there must necessarily be a detailed and individualized analysis of each authorization, including whether or not each distributor contends that a particular authorization is somehow not enforceable (e.g., that it was executed under duress or by fraud).[146] Second, the putative class members may only seek to recoup deductions taken on territories which they personally serviced. As set forth in Sections II.B.2 and II.C, *supra*, many distributors have purchased multiple territories and have hired employees and/or independent contractors to service those territories.[147] But the putative class members cannot make claims for alleged unlawful

---

146

deductions that do not directly correspond to services they personally rendered.   Thus, determination of these deductions will require an individualized week-to-week analysis of each putative class members' actual personal service vis-à-vis the debits from settlement statements for their territories.

**D.     The Court Should Not Certify a Rule 23 Class with Respect to The Maryland Claims Because Plaintiffs Have Failed to Establish Common Questions of Law or Fact and Because Individual Issues Predominate.**

> **1.     The Maryland Wage and Hour Law ("MWHL") Claim for Overtime Should Not Be Certified as a Class Action.**

>> **a.     The MWHL claim for overtime cannot be resolved on a class-wide basis because the threshold classification issue requires application of the economic realities test.**

Plaintiffs contend that Maryland uses a common law "master-servant" test to determine employee status under the MWHL, arguing that this test hinges on the "right of control" rather than "actual control" and thus renders differences in policy enforcement irrelevant. Plaintiffs misstate the law, as they rely erroneously on a string of cases that predate Maryland's adoption of the FLSA economic realities test for MWHL claims in *Campusano v. Lusitano Construction LLC,* 56 A.3d 303, 307-08 (Md. Ct. Spec. App. 2012).  *See Harbourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 661 n.5 (4th Cir. 2016) (citing *Campusano* for the proposition that "analysis of the existence of an employment relationship is the same under the MWHL and MWPCL as under the FLSA").   In Maryland, the economic realities test is a flexible standard consisting of "non-exclusive and overlapping set of factors," and different versions of the test have emerged for different purposes.  *Campusano*, 56 A.3d at 309 n.6 (citing *Newell v. Runnells*, 967 A.2d 729, 772 (Md. 2009)).   In *Newell*, 967 A.2d at 772, the Maryland Court of Appeals expressly endorsed a version of the economic realities test for independent contractor cases described in *Barfield v. N.Y.*

*City Health & Hospitals Corp.*, 537 F.3d 132, 142 (2d Cir. 2008)).  That test turns on the following non-exclusive factors, none of which is dispositive: "(1) the degree of control ***exercised*** by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."  *Barfield*, 537 F.3d at 142 (emphasis added).

Plaintiffs' errant attempt to resurrect the common law "right of control" test is unsurprising in light of the fact that their Maryland claims are inappropriate for class certification under the economic realities test because, on this record, employee status cannot be established through common evidence.  Maryland distributors differ significantly with respect to some of the most compelling indicia of independent contractor status.  For example, Plaintiff Brown does not employ a helper,[148] whereas Plaintiff Barra paid a helper $650 per week to run his business while Barra himself held down a job at United Airlines.[149]  Plaintiff Sisk pays a helper $50 per day, 5 days and 25 hours per week, to service his accounts while Sisk himself simultaneously performs distribution work for a Flowers competitor outside his Oxford territory.[150]  Plaintiff Pellettiere hired an employee to run his business for three months when he had knee surgery, but he has never taken advantage of the opportunity to operate a side business. [151]   Some Maryland distributors

---

[148] *See* sample authorization forms signed by Pennsylvania Plaintiffs Beese (Ex. A38), Jankowski (Ex. A41), and Daley (Ex. A45).
[148] Ex. A21, Brown Dep. at 182:14-25.
[149] Ex. 20, Barra Dep. at 43:1-53:18.
[150] Ex. A9, Sisk Dep. at 34:9-38:10.
[151] Ex. C, Pellettiere Decl. ¶ 35; Ex. A3, Pellettiere Dep. 96:11-13.

own distribution rights in only one territory, while others own multiple territories and rely on hired helpers to assist with operating their businesses.[152]  Some choose to incorporate.[153]

Maryland distributors claim to have varying degrees of control over everything from selecting products for their accounts,[154] rejecting product added to their orders,[155] deciding the order of servicing their accounts,[156] changing product facings,[157] seeking new accounts,[158] deciding what trucks to use,[159] and dress.[160]  They differ in the frequency of their interactions with Oxford managers,[161] field visits,[162] and breach letters.[163]  Additional discounts vary by distributor, and some Maryland distributors have never received it at all.[164]  Maryland distributors differ

---

[152] *Compare* Ex. A4, Dyson Dep. at 26:4-11 (he did not want a second territory), *with* Ex. H, LaClair 11/29/18 Decl. ¶ 6 (identifying several Maryland distributors with multiple territories).

[153] *Compare* Ex. C, Pellettiere Decl. ¶ 5, *with* Ex. A21, Brown Dep. at 183:1-184:24 (he decided not to incorporate after weighing the advantages and disadvantages and discussing it with others).

[154] *Compare* Ex. A17, T. Carr Dep. at 260:6-9 (as a distributor, he is free to add or subtract products going into his accounts), *with* Barra Dep. at 175:15-22 (he had no control over the selection of products delivered to store).

[155] *Compare* Ex. A17, T. Carr Dep. at 297:14-297:24 (when product was added to his load, he would delete it), *with* Ex. A4, Dyson Dep. at 93:20-94:3 (testifying that he could cut product off his load in the morning, but Oxford would "charge him back" or make him take it).

[156] *Compare* Ex. A9, Sisk Dep. at 80:21-81:5 (his "only freedom" is choosing the order of servicing his accounts), *with* Ex. A20, Barra Dep. at 93:2-96:4 (believes he would get in trouble for taking a different route than Oxford suggested).

[157] Ex. C, Pellettiere Decl. ¶ 28 ("I have changed my product facings at my accounts before to increase sales."); Ex. A9, Sisk Dep. at 64:11-65:3 (he has no input about where products can be placed; he has tried making recommendations but has not been successful).

[158] *Compare* Ex. A21, Brown Dep. at 210:1-3 (he is allowed to seek new accounts), *with* Ex. A9, Sisk Dep. 60:11-60:21 (he had no discretion over whether to add new accounts to his territory).

[159] *Compare* Ex. C, Pellettiere Decl. ¶ 44 ("I could have obtained a vehicle from any source I wanted to. Flowers did not give me any requirements for the type of vehicle to use."), *with* Ex. A4, Dyson Dep. at 76:8-76:14 ("When we first signed up, I was going to get my own truck, not take over the truck that they had, but they put a lot of pressure on us that they didn't want all these trucks sitting around. So you needed to take over the lease.").

[160] *Compare* Ex. A4, Dyson Dep. at 101:22-101:24 (distributors are not required to wear shirts with corporate logos), *with* Ex. A20, Barra Dep. at 109:14-109:16 (he was required to wear a uniform).

[161] *Compare* Ex. A9, Sisk Dep. at 84:19-85:3 (only spoke to his Area Director once every couple of weeks), *with* Ex. A20, Barra Dep. at 134:2-136:12 (Barra saw his sales manager every day and spoke with him very often via phone calls and text messages).

[162] *Compare* Ex. A9, Sisk Dep. at 96:12-96:20, 140:3-140:21 (former manager came to check on him sometimes once every two weeks, sometimes once a month, and sometimes every other month; current manager has never done so), *with* Ex. A3, Pellettiere Dep. at 187:19-188:11 (managers visit him at his stores only "once or twice a year").

[163] *Compare* Ex. A3, Pellettiere Dep. at 173:12-173:13 (never received a breach letter), *with* Ex. A9, Sisk Dep. at 88:7-88:21 (he has received 4 or 5 breach letters for such things as not rotating bread and using the wrong color ties).

[164] *Compare* Ex. A21, Brown Dep. at 307:6-308:2 (Brown has never received an additional discount), *with* Ex. A10, M. Carr Dep. at 146:20-147:11 (additional discount is route-specific).

significantly with respect to the length of their working relationship with Oxford.[165]  They make different choices with respect to investment in equipment such as delivery vehicles.[166]  Some distributors profit handsomely from purchasing and selling distribution rights, whereas others make little attempt to manage or capitalize on their equity investment.[167]

Given these and other factual disparities among the potential members of the Maryland class, there is simply no way to establish through common evidence whether Oxford's independent distributors are "employees" under the MWHL.  That determination will necessary require individualized assessment regarding the totality of the circumstances surrounding the relationship between Oxford and each contractor.  *See Dukes*, 548 U.S. at 350 ("the inquiry "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").  Consequently, Plaintiffs' cannot establish that common issues predominate over individual issues with respect to their putative Rule 23 claims under the MWHL.

> **b.**  **The MWHL claim for overtime cannot be resolved on a class-wide basis because Plaintiffs' hours of overtime work, if any, and Defendants' knowledge of the same are individualized inquiries and not subject to representative proof.**

Certification of Plaintiff's MWHL overtime claim should also be denied because the claim cannot be proven on a classwide basis.  To determine whether a class member has incurred "overtime" within the meaning of the MWA and the amount of any overtime, it must be determined

---

[165] Ex. H, LaClair 11/29/18 Decl. ¶ 7 (Ayers has been an independent distributor for well over seven years—since June 13, 2011—where Scott Clements was an independent distributor for only 3 months and 25 days—from June 30, 2014 to October 25, 2014).

[166] Ex. A10, M. Carr Dep. at 232:16-233:3 (he made a business decision to discontinue the lease on the bread truck provided by Oxford and instead to service his route with his own personal pick-up truck and trailer); Ex. C, Pellettiere Decl. ¶ 44 (describing his decision to rent a truck through Budget).

[167] Ex. A4, Dyson Dep. at 31:14-32:1, 84:10-84:12 (describing how he made approximately $25,000 by selling portions of his distribution rights).

how many hours that person actually worked.  *See* Md. Code, Lab. & Empl. § 3-415 (for purposes of calculating overtime hours, "each employer shall pay an overtime wage of at least 1.5 times the usual hourly wage"); Md. Code, Lab. & Empl. § 3-420 ("an employer shall computer the wage for overtime . . . on the basis of each hour over 40 hours that an employee works during 1 workweek"). Thus, the determination of whether overtime is owed must proceed on a case-by-case assessment to determine how many hours a person actually worked and certification is not proper.

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Faust v. Comcast Cable Comms. Mgmt., LLC*, 2011 WL 3534008 *10-14 (D. Md. 2014) (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (emphasis added); *see also Ealy v. Pinkerton Gov't Servs., Inc.*, 2013 WL 980035 (4th Cir. 2013) (finding that the district court abused its discretion by failing to provide a rigorous analysis pertaining to predominance requirement); *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 349 (W.D.N.Y. 2011) (denying class certification since "the claims are too highly individualized to form the basis for a proper class action" including those under the MWHL).  In *Faust*, the Court denied class certification finding that, while company policy was to record all the time that they worked, the plaintiffs were unable to meet the predominance requirement because there were variations as to when the plaintiffs actually began to work.  *See Faust*, 2014 WL 3534008, at *10-14 (D. Md. 2014) (noting that ["t]he evidence…reveals that [plaintiffs] engaged in a variety of activities between the time they logged into their computers and the time that they begin taking customer calls or engaged in other tasks related to their actual work functions").

Because Plaintiff's overtime claims must be resolved on an individualized basis, Plaintiffs cannot establish commonality or predominance.

> ### c.   The MWHL claim cannot be resolved on a class-wide basis because the Motor Carrier Act exemption requires individualized proof.

The MWHL expressly incorporates the FLSA's overtime exemption for individuals covered by the Motor Carrier Act ("MCA").   Md. Code, Lab. & Empl. § 3-415(c)(1) (creating MWHL exemption for any individual "for whom the United States Secretary of Transportation may set qualifications and maximum hours of service under 49 U.S.C. § 31502.").  *See also Veney v. John W. Clarke, Inc.*, 28 F. Supp. 3d 435, 441 (D. Md. 2014) ("Maryland's statutory right to overtime compensation is parallel to the same right under the FLSA.  Maryland grants the same exemption as is granted in federal law by the [MCA] exemption.  Consequently, if the MCA exemption defeats Plaintiffs' claim under the FLSA, then it will also defeat their state law claim to overtime compensation.").  The MCA exemption applies to any Maryland class member who personally delivered product in a vehicle with a gross vehicle weight rating of at least 10,001 pounds in interstate commerce.  *See* 49 U.S.C. § 31132; 29 U.S.C. § 213(b)(1).   Application of the MCA exemption will require an evaluation of whether, how often, and for what purpose each class member transported products in interstate commerce using vehicles that weigh less than 10,001 pounds.

Just as with Pennsylvania distributors, application of the MCA exemption in Maryland cannot be resolved through representative evidence applicable to all Plaintiffs.  The alleged use of personal vehicles (weighing less than 10,001 pounds) by some—but not all—distributors to transport product will require an individualized inquiry into each distributor's use of personal vehicles on a weekly basis.  *See, e.g.,* Ex. C, Pellettiere Decl. ¶ 48 ("I believe whether Distributors

use their personal vehicles and, if so, the amount of time they do, varies from Distributor to Distributor based on many factors."). Some Plaintiffs admitted they only transported product only in their DOT vehicles, using their personal vehicles exclusively on non-delivery days to drive to their accounts and rearrange product already located there.[168] Others used their personal vehicles to transport product on a *de minimis* basis, which Defendants contend is insufficient to defeat the exemption.[169] Maryland distributors also differ with respect to whether they keep records of their personal vehicle use, though none provide such records to Oxford.[170] Consequently, the individualized inquiries required by the MCA exemption in this case make certification of a MWHL Rule 23 class inappropriate. *See Harrison*, 2016 WL 826824, at *3, 6 (decertifying FLSA collective action where, *inter alia*, application of the motor carrier exemption required examination of individualized evidence regarding vehicle size and the amount of interstate travel).

### d. The MWHL claim cannot be resolved on a class-wide basis because the outside sales exemption requires individualized proof.

Maryland law also exempts outside salespersons from the definition of "employee" applicable to overtime payment. Md. Code, Lab. & Empl. § 3-403(4). "The FLSA, and, by extension, the [Maryland Wage and Hour Law], exempt certain employees from the requirements of overtime wages, including employees . . . in the capacity of outside salesman." *Drubetskoy v. Wells Fargo Bank, N.A.*, 2013 WL 6839508, at *7 (D. Md. Dec. 20, 2013). As with Pennsylvania distributors, individual factual inquiries will be necessary to determine whether Maryland

---

[168] Ex. A4, Dyson Dep. at 74:17-75:13, 77:25-78:11.

[169] Ex. A21, Brown Dep. at 171:1-175:12 (estimating that he moved product in his personal vehicle approximately 20 times per year).

[170] Ex. A20, Barra Dep. at 116:10-117:6 (does not keep track of when he uses his personal vehicle and does not provide any information about personal vehicle usage to Oxford); Ex. A4, Dyson Dep. at 78:3-11 (records personal vehicle mileage every year for tax purposes, but does not share that information with Oxford and does not record how often he uses personal vehicle to transport product).

distributors fall within the scope of the MWHL outside sales exemption.  Plaintiff Tumblin testified that when he was an Oxford Sales Director, he sought to recruit independent distributors who were "motivated salesmen, to grow sales" because "at the end of the day, the name of the game is to sell more bread."[171]  However, Maryland distributors differ significantly with respect to their efforts to grow sales by, *inter alia,* seeking new accounts,[172] asking store managers for special displays,[173] seeking additional shelf space,[174] recommending new products,[175] and advertising.[176]  Given the individualized nature of the evidence relevant to the MWHL outside sales exemption, that claim is inappropriate for class treatment.[177]

### 2.    The Maryland Wage Payment Collection Law ("MWPCL") Claim for Deductions Should Not Be Certified as a Class Action.

As with the MWHL, Maryland courts rely on the FLSA economic realities test to evaluate whether an individual is an "employee" for purposes of the MWPCL.  *Harbourt*, 820 F.3d at 661 n.5 ("analysis of the existence of an employment relationship is the same under the MWHL and MWPCL as under the FLSA").  As discussed above, individual inquiries predominate over common issues in any determination of employee status under the Maryland economic realities test.[178]  Even if employee status under the MWPCL could be proven through common evidence,

---

[171] Ex. A25, Tumblin Dep. at 176:24-177:16.

[172] Ex. A20, Barra Dep. at 74:23-76:5 (makes no effort to obtain new accounts because he does not believe it to be part of his job); Ferranti Decl. ¶ 50 (he added Dollar Tree, Pollo Campero, and Denny's accounts to his territory).

[173] *Compare* Ex. A21, Brown Dep. at 202:19-24 (he has asked a store manager to put up special displays without Oxford telling him to do it), *with* Ex. A20, Barra Dep. at 57:4-63:2 (he has never asked for displays because he does not believe they increase sales).

[174] *Compare* Ex. A3, Pellettiere Dep. at 108:22-109:6 (he did not seek permission from Oxford before asking a store manager for additional space), *with* Ex. A4, Dyson Dep. at 46:13-47:2 (never asked for additional space in his accounts).

[175] *Compare* Ex. A9, Sisk Dep. at 95:2-4 (he has never recommended products to his accounts), *with* Ex. C, Pellettiere Decl. ¶ 21 (acknowledging he introduced new products to his cash accounts to see what would sell).

[176] *Compare* Ex. A9, Sisk Dep. at 102:1-103:5 (he advertises for his distributorship "all the time"), *with* Ex. A4, Dyson Dep. at 54:4-54:14 (he does not advertise).

[177] *See* cases and discussion in § III.C.1.d, *supra*.

[178] *See* § III.D.1.a, *supra*.

which it cannot, individualized evidence would be necessary to resolve the merits of each class member's claim.  The MWPCL allows deductions from pay where they are authorized in writing. Md. Code, Lab. & Empl. § 3-503.  Maryland distributors do in fact authorize Oxford to take certain deductions from their weekly settlement statements, although the deductions and authorizations vary by distributor.[179]  Individualized evidence would be necessary to evaluate any claim by Maryland class members that these authorizations were unenforceable by virtue of duress, fraud, or the like.  Individualized evidence would be necessary to determine whether Maryland class members are seeking to recoup deductions for weeks when they did not personally service their territories.  Consequently, Plaintiffs' claim for deductions under the MWPCL is inappropriate for class certification under Rule 23.

**E.     The Court Should Not Certify a Rule 23 Class with Respect to The New Jersey Claims Because Plaintiffs Have Failed to Establish Common Questions of Law or Fact and Because Individual Issues Predominate.**

**1.     The New Jersey Wage and Hour Law ("NJWHL") Claim for Overtime Should Not be Certified as a Class Action.**

**a.     The NJWHL claim cannot resolved on a class-wide basis because the threshold classification issue requires application of the ABC test.**

Plaintiffs' claims under the ABC test raise individualized inquiries that preclude class certification.  New Jersey has adopted the "ABC" test for determining whether a worker is an employee or an independent contractor under the New Jersey Wage Payment Law.  *Hargrove v. Sleepy's LLC*, 612 F. App'x 116, 118 (3d Cir. 2015).  The "ABC" test presumes that a worker is an employee unless the alleged employer can show that:

---

[179] *See* sample authorization forms signed by Maryland Plaintiffs Barra (Ex. A37), Dyson (Ex. A40), and Tumblin (A42).

(A)   Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(B)   Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C)   Such individual is customarily engaged in an independently established trade, occupation, profession or business.[180]

<u>Prong A: Plaintiffs Cannot Demonstrate Common Evidence Regarding Control or Direction</u>

Part A of the ABC test contemplates not only the right of control over a worker's performance under the applicable agreement, but also the *actual degree* of control or direction over performance the worker experienced in practice.  N.J. Stat. Ann. § 43:21–19(i)(6) ("[s]uch individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact."); *Magalhaes v. Lowe's Home Ctrs., Inc.*, 2014 WL 907675, at *4 (D. Mass. Mar. 10, 2014) (explaining that Prong A required an individualized analysis of whether company had control-in-fact where "the installers report various levels of interaction with Lowe's representatives and various degrees of dependence on Lowe's workflow").  To satisfy Prong A, the employer must show that it neither exercised control over the worker, nor had the ability to exercise control in terms of the completion of the work.  *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 459 (N.J. 2015).  Factors to consider include "whether the worker

---

[180] *Id.*  "[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) (quoting Fed. R. Civ. P. 23 Advisory Committee note (2003))  The elements of the independent contractor test cannot be viewed in isolation, and the Court cannot "shortcut the statutory test by making the classification decision based solely on common evidence directed" at just one of the three prongs. *Schwann v. FedEx Ground Package Sys., Inc.*, 2013 WL 1292432, at *3 (D. Mass. Apr. 1, 2013). To do so would "effectively presume that the [class members] were employees," which is impermissible at this stage. *Id.; see also In re FedEx Ground Package Sys., Inc., Empl. Practices Litig.*, 273 F.R.D. 516, 523 (N.D. Ind. 2010) (declining to revisit denial of class certification based on common evidence in support of only one prong of the ABC test: "deciding whether the plaintiffs can succeed on any one of the elements in the ABC test by presenting common evidence, rendering the remaining two elements irrelevant, effectively decides the merits of the claim.").

56

is required to work any set hours or jobs, whether the enterprise has the right to control the details and the means by which the services are performed, and whether the services must be rendered personally." *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 593 A.2d 1171, 1189 (N.J. 1991); *ABS Grp. Servs., Inc. v. Bd. of Review*, 2014 WL 11291266 at *4 (N.J. Super. April 27, 2016). The test does not envision that an independent contractor be entirely free of any control; indeed, an independent contractor relationship still exists when the worker "was permitted to perform the work by any means that he sought fit and in any sequence that he chose." *Phila. Newspapers, Inc. v. Bd. of Review*, 937 A.2d 318, 326 (N.J. App. Div. 2007).

As a preliminary matter, the Distributor Agreements grant distributors numerous rights and freedoms and contain multiple indicia of independent contractor status.[181] Plaintiffs simply cannot rely on the Distributor Agreement alone as common evidence of control by Defendants; if anything, the Distributor Agreement demonstrates a *lack* of control by Defendants. Furthermore, Plaintiffs fail to set forth actual evidence of control by common proof. First, virtually all of the "control" alleged by Plaintiffs—with respect to product pricing, product placement, adhering to promotions, time and frequency of service, and other service requirements—in fact has always been dictated by the *customer*, not Defendants.[182] Indeed, the customers' demands exist regardless of the contract or who is performing. As a matter of law, these customer requirements are irrelevant to a determination of independent contractor status. *See Fed-Ex Home Delivery v. NLRB*, 563 F.3d 492, 501 (D.C. Cir. 2009) ("[C]onstraints imposed by customer demands . . . do not determine the employment relationship").

---

[181] *See* § II.A.1, *supra*.

[182] *See* § II.B.1, *supra*. *See* Ex. A2, Castleberry Dep. 129:20-130:3 (testifying that Giant required him to make deliveries on certain days and that request came directly from Giant, not Flowers).

Second, and in any event, there is no alleged policy or practice of control that was exerted uniformly over all distributors.  To the contrary, on nearly *every aspect* of the "means and methods" of distributors' businesses—from product ordering, pricing, and placement, to setting routes and scheduling—distributors report vastly different, often directly contradictory, experiences.[183]  For example, with regard to scheduling, Plaintiff Walls testified that Flowers controlled when to service stores, and that distributors had to be at certain stores by a certain time.[184]  On the other hand, Plaintiff Castleberry testified that Giant was the only store that he had that required him to make deliveries on certain days, and that request came directly from Giant, not Flowers.[185]  Additionally, with respect to product ordering, Plaintiff Boulange testified that "[s]ome of the ordering was outside of my control. On a day-to-day basis, I was able to do a lot of orders, the orders myself, but they were – they were always monitored.  If they didn't or weren't at where they wanted them to be, they would interject,"[186] while Plaintiff Walls testified that he could "ignore" the suggested orders and "always" had to readjust them.[187]  These differences encompassed product placement[188] and displays as well.[189]

Most importantly, however, Plaintiffs cannot credibly claim that they were personally subject to any amount of control by Defendants when Defendants allowed them to outsource their work, and many distributors actually chose to do so.  *See, e.g., Luxama v. Ironbound Express, Inc.*, 2012 WL 5973277, at *4 (D.N.J. Jun. 28, 2013) (company did not have control sufficient to find

---

[183] *See* §§ II.B and C, *supra*.
[184] Ex. A16, Walls Dep. at 65:20-66:3.
[185] Ex. A2, Castleberry Dep. 129:20-130:3.
[186] Ex. A12, Boulange Dep. 321:12-24.
[187] Ex. A16, Walls Dep. at 194:3-12.
[188] *Compare* Ex. A2, Castleberry Dep. at 116:5-11 (all of his accounts had planograms), *with* Ex. A12, Boulange Dep. at 51:23-52:4 (not all of his accounts had planograms).
[189] Ex. A12, Boulange Dep. at 142:15-18 (he does not recall ever asking for an end cap), *with* Ex. A2, Castleberry Dep. 113:7-15 (he sought end caps so that customers can see his product—for product exposure and to increase sales).

employment relationship when the independent contractors could "hire employees to assist . . . were solely responsible for the direction and control of [these individuals], including selecting their wages, hours, working conditions"). Each of Boulange, Castleberry, and Walls understood that they could hire helpers, with Castleberry and Walls engaging in such a practice.[190] Thus, determination of Prong A is not susceptible to proof by any sort of common evidence and would necessarily require a highly individualized inquiry into the actual circumstances and experiences of each putative class member. This same conclusion was reached in another case brought by Flowers distributors in California, *Martinez v. Flowers Foods, Inc.*, where the District Court denied class certification. In that case, despite noting that the putative class members' responsibilities all stemmed from the same Distributor Agreement, the court found that the language was so broad that it did not reflect a uniform policy. Moreover, given the variations among the individual distributors' experiences, the question of "control" was not amenable to class-wide proof. *Martinez v. Flowers Foods, Inc.*, 2016 WL 10746664, at *11-12 (C.D. Cal. Feb. 1, 2016) (denying class certification, finding that "the evidence undermines any argument that Defendants uniformly controlled [distributors'] manner of operating their respective businesses in their territories" and concluding that "any examination of the right to control would necessarily spawn a host of individualized inquiries"). The same reasoning applies here.

Prong B: Plaintiff Cannot Establish Prong B Through Common Evidence Regarding Where Services Were Performed.

Part B of the statute requires the employer to show that the services provided were "either outside the usual course of the business . . . or that such service is performed outside of all the places of business of the enterprise." N.J.S.A. 43:21–19(i)(6)(B). This portion of the standard is

---

[190] *See* Ex. A12, Boulange Dep. 105:1-4 (he understood he had the option to hire help); Ex. A2, Castleberry Dep. 65:10-66:11 (he hired a friend who worked for him almost every day for three months); Ex. A16, Walls Dep. at 89:23-90:15 (he hired helpers to run his route while he was away on vacation).

disjunctive.  As such, an employer only needs to show that the services provided were either outside the usual course of business *or* that the services is performed outside of all the places of business of the enterprise.  Services are "performed outside of all the places of business of the enterprise" if they take place outside "locations where the enterprise has a physical plant or conducts an integral part of its business." *Carpet Remnant Warehouse, Inc.*, 593 A.2d at 1190 (carpet installers satisfied this aspect of the independent contractor analysis where they worked at customer homes outside the company's places of business).  This determination is fact-sensitive, requiring an evaluation in each case of the substance, not the form, of the relationship. *Carpet Remnant*, 593 A.2d at 1185.  Thus, determination of Prong B is not susceptible to proof by any sort of common evidence and would necessarily require a highly individualized inquiry into the actual circumstances and experiences of each putative class member.

Prong B is Preempted by the FAAAA.

The Federal Aviation Administration Authorization Act of 1994 ("FAAAA") preempts any state or local "law, regulation, or other provision having the force and effect of law *related to a price, route, or service* of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."  49 U.S.C. § 14501(c)(1) (emphasis added).[191]  The First Circuit has concluded that the FAAAA preempts Prong B of the ABC test in Massachusetts.  See *Schwann*, 813 F.3d at 436.  Applying the broad FAAAA preemption standard in a misclassification case brought by FedEx delivery drivers, the First Circuit expressly held Prong B of the Massachusetts "ABC" test preempted as applied to a motor carrier.  *Schwann*, 813

---

[191] The issue of whether the ABC test is preempted by the FAAA is currently on appeal to the Third Circuit.  *See Bedoya v. Am. Eagle Exp. Inc.*, 2017 WL 4330351 (D.N.J. Sept. 29, 2017), *appeal docketed*, No. 18-1641 (3rd Cir. Mar. 27, 2018). Appellants in that case raise a similar argument regarding the First Circuit's finding that the FAAA preempts Prong B of the ABC test.  *See* Br. For Appellant, *Bedoya,* 2018 WL 3390308, at *20.

F.3d at 435-440.  Like Prong B of the New Jersey ABC test, Prong B of the Massachusetts test requires that the service performed by an independent contractor be "outside the usual course of the business of the employer."  M.G.L. c. 149, § 148B(2).  The Court reasoned that because "Prong [B] requires a judicial determination of the extent and types of motor carrier services that FedEx provides . . . [t]he text of Prong [B] as applied in this way thus expressly references FedEx's motor carrier services."  *Id.* at 437-38.  Thus, Prong B caused "regulatory interference" by "preclud[ing] FedEx from providing delivery services through an independent person who bears the economic risk associated with any inefficiencies in performance," and would have a significant effect on the carrier's routes and services as a matter of logic.  *Id.* at 438-39.  Defendants are motor private carriers under the FAAAA that bake and transport product in interstate commerce.  The New Jersey ABC test, and at a minimum, Prong B of that test, is preempted by the FAAAA under the reasoning in *Schwann* and therefore not properly considered by this Court as grounds for certification of the class.

### Prong C: Plaintiff Cannot Demonstrate Common Evidence Regarding Distributors' Independent Businesses.

Under Prong C, the Court conducts an inquiry into whether "[s]uch individual is customarily engaged in an independently established trade, occupation, profession or business. N.J. Stat. Ann. § 43:21–19(i)(6). "[I]f the person providing services is dependent on the employer, and on termination of that relationship would join the ranks of the unemployed, the C standard is not satisfied. Conversely, the C standard is satisfied when a person has a business, trade, occupation, or profession that will clearly continue despite termination of the challenged relationship." *Carpet Remnant Warehouse, Inc.*, 593 A.2d at 1187; *see also Magalhaes*, 2014 WL 907675, at *6 ("Like Prongs A and B, Prong C requires an individualized factual inquiry.  As

Lowe's has shown, some installers have their own incorporated businesses . . . while others do not.") (internal quotations omitted).

As set forth in the Distributor Agreements, distributors and their companies have the freedom to engage in outside business including, explicitly, the right to carry any non-competing products in the performance of their distributorships.  Distributors are also, of course, not required to personally service any of their territories, and can choose instead to engage in any other business.[192]  The evidence demonstrates, however, that distributors vary widely in the extent to which they operate as independently established businesses.[193]  Though some distributors use their companies solely to distribute Flowers products, others conduct outside businesses and use their distributorships to sell and distribute other non-Flowers products.[194]  This evidence demonstrates that putative class members vary considerably with respect to whether they are actually engaged in an independently established trade or business, and this prong of the ABC test cannot be determined based on any common evidence.  *See, e.g., Eshavarria v. Williams Sonoma, Inc.*, 2016 WL 1047225, at *12 (D.N.J. 2016). ("The Driver/Helper Plaintiffs cannot prove their case without individualized evidence. At trial, the Driver/Helper Plaintiffs will first have to show that MXD employed them, most likely under the Enterprise joint employer theory, and then show that they were employees under the ABC test. Both tests turn on the specific relationship between the worker and the purported employer, and control is a key element.").  This same conclusion was reached

---

[192] *See* § II.B.2, *supra.  See also* Ex. A16, Walls Dep. at 89:23-90:15 (testifying that he hired helpers to run his route while he was away on vacation).

[193] *Compare* Ex. E, Steinheimer Decl. ¶ 12 (describing freedom to disregard recommendations and suggestions from Oxford Area Director)

[194] *Compare* Ex. A12, Boulange Dep. at 115:17-117:19 (stating that he was aware that he had the option to engage in non-competing work, but did not pursue that opportunity), *with* Ex. A16, Walls Dep. at 32:21-33:6 (testifying that while having his Flowers distributorship, Walls dedicated two hours a day to his coffee business.  He spent his time entering invoices, selling, and placing orders.).

in another case brought by Flowers distributors, *Soares*.  There, the court denied class certification in relevant part because the determination whether a distributor was engaged in a distinct business or occupation was "riddled with individualized inquiries" and, therefore, predominance was not satisfied.  *Soares*, 320 F.R.D. at 482.  The same reasoning applies here.

> **b.      The NJMWA claim cannot be resolved on a class-wide basis because their hours of overtime work, if any, and Defendants' knowledge of same are necessarily individualized and not subject to representative proof.**

Certification of Plaintiff's MWA overtime claim should also be denied because the claim cannot be proven on a classwide basis.  To determine whether a class member has incurred "overtime" within the meaning of the NJWHL and the amount of any overtime, it must be determined how many hours that person *actually* worked.  *See* N.J. Stat. Ann. 34:11-56a4 (an employee is entitled to "1-1/2 times such employee's regular hourly wage for each hour of working time in excess of 40 hours in any week.").  Thus, the determination of whether overtime is owed must proceed on a case-by-case assessment and certification is not proper.  *In re Linerboard Antitrust Litig.*, 305 F.3d at 156 ("If proof of the essential elements of the cause of action requires individual treatment, the class certification is unsuitable."); *Reed v. Empire Auto Parts, Inc.*, 2015 WL 761894, at *9–10 (D.N.J. Feb. 23, 2015) (finding predominance requirement not met for NJWHL class due to the "necessarily individualized nature of the inquiry needed into each driver's individual circumstances.").  For example, in *Merlo v. Federal Express Corp.*, 2010 WL 2326577, at *6 (D.N.J. June 7, 2010), the Court denied class certification where it "would have to undertake individualized factual inquiries regarding whether particular employees were required to perform unpaid work, whether they actually did perform unpaid work, and how much unpaid work they performed to resolve class members WHL [claims]."  Similarly here, the Court would have to

undertake individualized factual inquiries regarding when the distributors worked, which would vary significantly depending on whether the distributors hired helpers and when they decided to work.[195]   Because Plaintiff's overtime claims must be resolved on an individualized basis, Plaintiffs cannot establish commonality or predominance.

**c.   The NJWHL claim cannot be resolved on a class-wide basis because the outside sales exemption requires individualized proof.**

New Jersey law exempts bona fide outside sales people from its overtime requirements. N.J. Stat. Ann. 34:11-56a4; N.J. Admin. Code 12:56-7.1. To qualify for the outside sales employee exemption, an employee must meet the requirements established under the federal Fair Labor Standards Act and its related regulation.   N.J. Admin. Code 12:56-7.2.   The outside sales exemption from overtime requirements applies to "any employee employed...in the capacity of outside salesman."   29 U.S.C. § 213(a)(1). This includes any employee whose primary duty is making sales or obtaining orders or contracts and who is customarily and regularly engaged away from the employer's place of business in performing such primary duty.  29 C.F.R. § 541.500(a). Drivers who both deliver and sell products fall within the outside sales exemption "only if the employee has a primary duty of making sales." 29 C.F.R. § 541.504(a). Factors that a court may use to determine whether a driver's primary duty is making sales include, but are not limited to: "a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining

---

[195] *See e.g.*, Ex. A16, Walls Dep. at 89:23-90:15 (he hired helpers to run his route while he was away on vacation); Ex. A2, Castleberry Dep. 65:10-66:11 (he hired a friend who worked for him almost every day for three months); Ex. A12, Boulange Dep. 186:6-186:12 (he decided what time to arrive at the warehouse).

64

agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales." 29 C.F.R. § 541.504(b).

The District of New Jersey has recognized that the question of whether an employer has properly classified a position as exempt from the FLSA overtime pay requirements compels a court to perform "an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria" to determine whether all employees in that position uniformly carried out similar duties and responsibilities. *Aquilino v. Home Depot, U.S.A., Inc.*, 2011 WL 564039, at *7 (D.N.J. 2011) (citing *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 495 (D.N.J. 2000)).  These individualized inquiries required under the outside sales exemption "defeat the point of a collective action."  *See Grace v. Family Dollar Stores,* 2007 WL 2669699, at *2-3 (W.D.N.C. Sep. 6, 2007) ("the variations in duty are the very reason why a collective action is inappropriate"); *Bearden v. AAA Auto Club South,* No. 2:11–cv– 03104–JTF, 2013 WL 1181474, at *8 (W.D. Tenn. Mar. 18, 2013) (variances between sales methods and time allocations demonstrate need for individualized proof as well as that potential class members are not similarly situated); *Romero v. H.B. Auto. Group,* 2012 WL 1514810, at *13 (S.D.N.Y. May 1, 2012) (need for individualized inquiry compounded when proposed class contains individuals with varied job duties who may have been misclassified under different FLSA exemptions (*e.g.*, the MCA overtime exemption and the outside sales exemption)).

### 2. The New Jersey Wage Payment Law ("NJPWL") Claim for Deductions Should Not be Certified as a Class Action Because the Threshold Classification Issue Requires Application of the ABC Test.

Plaintiffs' NJWPL deductions claim cannot be resolved on a class-wide basis because the threshold classification issue requires applicable of the ABC test.  As demonstrated above,

determination of the ABC test is not susceptible to proof by any sort of common evidence and would necessarily require a highly individualized inquiry into the actual circumstances and experiences of each putative class member.

Similarly, even if the putative class could prove employee status by common evidence, which they cannot, the NJWHL clearly provides that deductions from pay are permitted where the employee has authorized the deduction in writing.  N.J.S.A. 34:11–4.4.[196]  Again, as demonstrated above, determination of the available remedies would require highly individualized inquiries. Namely, there must necessarily be a detailed and individualized analysis of each authorization, including whether or not each distributor contends that a particular authorization is somehow not enforceable.[197]  Thus, determination of these deductions will require an individualized week-to-week analysis of each putative class members' actual personal service vis-à-vis the debits from settlement statements for their territories.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification in these consolidated cases and enter such relief as the Court deems proper and just.

---

[196] *See, e.g.,* Ex. E, Reaves Decl. ¶ 36 ("Flowers has not taken any deductions from my settlement statement without my permission.").
[197] *See* sample authorization forms signed by New Jersey Plaintiffs Boulange (Ex. A36), Castleberry (Ex. A39), and Walls (Ex. A43).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(f), Defendants respectfully request the opportunity for oral argument on this motion.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH SMOAK & STEWART, P.C.**

By:  */s/ K. Clark Whitney*
K. Clark Whitney (PA 201052)
1735 Market Street, Suite 3000
Philadelphia, Pennsylvania 19103
T: (215) 995-2800
F: (215) 995-2801
clark.whitney@ogletreedeakins.com

Kevin P. Hishta (*pro hac vice* )
Margaret S. Hanrahan (*pro hac vice*)
191 Peachtree Street, N.E., Suite 4800
Atlanta, GA 30303
T: (404) 870-1733
F: (404) 870-1732
kevin.hishta@ogletreedeakins.com
maggie.hanrahan@ogletreedeakins.com

Michael J. Murphy (*pro hac vice*)
Christopher E. Humber (*pro hac vice*)
1909 K Street, N.W., Suite 1000
Washington, D.C. 20006
T: (202) 887-0855
F: (202) 887-0866
michael.murphy@ogletreedeakins.com
chris.humber@ogletreedeakins.com

*Attorneys for Defendants*

67

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2018, a copy of the foregoing was filed with the ECF system of the United States District Court for the Eastern District of Pennsylvania, which will give notice to the following counsel of record listed below.

### Counsel for the Plaintiffs in *Carr*:

Charles E. Schaffer, Esq.
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania  19106
(215) 592-1500
cschaffer@lfsblaw.com

Shawn J. Wanta, Esq.
Scott A. Moriarity, Esq.
Christopher D. Jozwiak, Esq.
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, Minnesota  55402
(612) 252-3570
sjwanta@baillonthome.com
samoriarity@baillonthome.com
cdjozwiak@baillonthome.com

Susan E. Ellingstad, Esq.
Rachel A. Kitze Collins, Esq.
Brian D. Clark, Esq.
Devona L. Wells, Esq.
LOCKRIDGE    GRINDAL    NAUEN
P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota  55402
(612) 339-6900
seellingstad@locklaw.com
rakitzecollins@locklaw.com
bdclark@locklaw.com
dlwells@locklaw.com

J. Gordon Rudd, Esq.
David M. Cialkowski, Esq.
Behdad C. Sadeghi, Esq.
ZIMMERMAN REED PLLP
111 IDS Center
80 South 8th Street
Minneapolis, Minnesota  55402
(612) 341-0400
Gordon.Rudd@zimmreed.com
David.Cialkowski@zimmreed.com
Behdad.Sadeghi@zimmreed.com

Case 2:15-cv-06391-WB   Document 268   Filed 11/30/18   Page 82 of 82

**<u>Counsel for the Plaintiffs in *Boulange*</u>:**

| | |
|---|---|
| Peter D. Winebrake, Esq. | James C. Veith, Esq. |
| R. Andrew Santillo, Esq. | VEITH LAW FIRM |
| Mark J. Gottesfeld, Esq. | 100 West Main Street, Suite 320 |
| WINEBRAKE & SANTILLO, LLC | Lansdale, PA 19446 |
| Twining Office Center, Suite 211 | (215) 368-9100 |
| 715 Twining Road | jim@veithlawfirm.com |
| Dresher, PA 19025 | |
| (215) 884-2491 | James J. Hollawell, Esq. |
| pwinebrake@winebrakelaw.com | LAW OFFICE OF JAMES J. HOLLAWELL, PC |
| asantillo@winebrakelaw.com | 8 Millers Road |
| mgottesfeld@winebrakelaw.com | Newtown, PA 18940 |
| | (215) 633-0494 |
| | jhollawell@verizon.net |

A courtesy copy of the foregoing has been mailed to the Chambers of the Honorable Wendy

Beetlestone by Federal Express.


      */s/ K. Clark Whitney*
      K. Clark Whitney (PA 201052)
      1735 Market Street, Suite 3000
      Philadelphia, PA 19103
      T: (215) 995-2800
      F: (215) 995-2801
      clark.whitney@ogletreedeakins.com

36536633.1